Slip Op. 16- 4

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **CALGON CARBON CORPORATION, and CABOT NORIT AMERICAS, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>**ALBEMARLE CORPORATION, NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON COMPANY, LTD., CARBON ACTIVATED CORPORATION, JACOBI CARBONS AB, and JACOBI CARBONS, INC.,**<br><br>Defendant-Intervenors. | **Before: Jane A. Restani, Judge**<br><br>**Consol. Court No. 14-00326** |

## <u>OPINION</u>

[Commerce's final results in antidumping duty periodic review are remanded.]

Dated: January 20, 2016

<u>John M. Herrmann II</u>, Kelley Drye & Warren, LLP, of Washington, DC, argued for plaintiffs.  With him on the brief were <u>R. Alan Luberda</u> and <u>David A. Hartquist</u>.

<u>Melissa M. Devine</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Michael T. Gagain</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Jeffrey S. Grimson</u>, Mowry & Grimson, PLLC, of Washington, DC, argued for defendant-intervenors Albemarle Corporation and Ningxia Huahui Activated Carbon Co., Ltd.

With him on the brief were <u>Kristin H. Mowry</u>, <u>Jill A. Cramer</u>, <u>Sarah M. Wyss</u>, and <u>Daniel R. Wilson</u>.

<u>Francis J. Sailer</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for defendant-intervenor Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd.  With him on brief were <u>Kavita Mohan</u> and <u>Dharmendra N. Choudhary</u>.

<u>Gregory S. Menegaz</u>, deKieffer & Horgan PLLC, of Washington, DC, argued for defendant-intervenor Carbon Activated Corporation.  With him on the brief were <u>J. Kevin Horgan</u> and <u>Alexandra H. Salzman</u>.

<u>Claudia D. Hartleben</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for defendant-intervenors Jacobi Carbons AB and Jacobi Carbons, Inc.  With her on brief was <u>Daniel L. Porter</u>.

Restani, Judge: This action challenges the Department of Commerce's ("Commerce") final results of the sixth administrative review of the antidumping ("AD") duty order on certain activated carbon from the People's Republic of China ("PRC"), covering the period of review ("POR") of April 1, 2012 through March 31, 2013.  <u>Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013</u>, 79 Fed. Reg. 70,163, 70,163 (Dep't Commerce Nov. 25, 2014) ("<u>Final Results</u>").  Before the court is a motion for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT" or "CIT") Rule 56.2 filed by Calgon Carbon Corporation ("Calgon") and Cabot Norit Americas, Inc. ("Cabot") (collectively, "petitioners" or "domestic industry").  Pls.' Mot. for J. on the Agency R., ECF No. 52.  Also before the court is a motion for judgment on the agency record pursuant to USCIT Rule 56.2 filed by importer Carbon Activated Corporation ("CAC").  Pl.'s Mot. for J. on the Agency R., ECF No. 53.  For the reasons stated below, Commerce's <u>Final Results</u> are remanded.

## BACKGROUND

Commerce initiated the sixth administrative review of certain activated carbon from the PRC, which it considers a non-market economy ("NME").  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 78 Fed. Reg. 33,052, 33,054–56 (Dep't Commerce June 3, 2013) ("Initiation Notice").  In the Initiation Notice, Commerce stated its policy that, when dealing with an NME, Commerce "begins with a rebuttable presumption that all companies within the country are subject to government control . . . [and] assign[s] all exporters . . . in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate."  Id. at 33,053.  Commerce also clarified that all companies seeking separate rate status "must complete, as appropriate, either a separate rate application or certification," and Commerce included Shanxi DMD Corporation ("Shanxi DMD") as one of the firms required to follow this procedure.  Id. at 33,053, 33,056.  Commerce limited its review to the two largest exporters/producers by volume of certain activated carbon, Jacobi Carbons AB ("Jacobi") and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("Cherishmet"), basing its selection on U.S. Customs and Border Protection ("Customs") entry data.   Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review:  Certain Activated Carbon from the People's Republic of China at 3–4, A-570-904, (May 16, 2014), available at http://enforcement.trade.gov/ frn/summary/prc/2014-11892-1.pdf (last visited Jan. 6, 2016) ("Preliminary I&D Memo").

In calculating a dumping margin for products from an NME country, Commerce compares the goods' normal value,[1] derived from factors of production ("FOPs") as valued in a

_____

[1] Normal value is

(continued . . .)

surrogate market economy ("ME") country, to the goods' export price.[2]  19 U.S.C.

§ 1677b(c)(1)(B) (2012).  Commerce must use the "best available information" in selecting

surrogate data for which to value FOPs.  Id.  The surrogate data must "to the extent possible" be

from an ME country that is "at a level of economic development comparable to that of the

nonmarket economy country" and is a "significant producer[] of comparable merchandise."  19

U.S.C. § 1677b(c)(4)(A)–(B).

On May 22, 2014, Commerce published its preliminary results.  Certain Activated

Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty

Administrative Review; 2012-2013, 79 Fed. Reg. 29,419, 29,419 (Dep't Commerce May 22,

2014) ("Preliminary Results").  In calculating normal value, Commerce selected the Philippines

as the primary surrogate country.[3]  Preliminary I&D Memo at 17.  Commerce relied on Global

Trade Atlas ("GTA") data to value certain FOPs, disregarding prices from NME countries, prices

that may have been dumped or subsidized, and imports originating from unspecified countries.

---

the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price,

and "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price."  See 19 U.S.C. § 1677b(a)(1)(A), (B)(i) (2012).

[2] Export price is "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States."  19 U.S.C. § 1677a(a).

[3] Commerce had previously determined that the Philippines, Indonesia, Thailand, Colombia, South Africa, and Costa Rica were all countries at a comparable level of economic development to the PRC.  Commerce's Letter re: Deadlines for Surrogate Country and Surrogate Value Cmts. at 1–3, PD 73 (Aug. 2, 2013).

Id. at 24.  Based on this methodology, Commerce calculated a surrogate value ("SV") of $1.19

per kilogram for anthracite coal (the main input), relying on contemporaneous with the present

sixth POR ("POR6-contemporaenous") GTA data from the Philippines under HTS number

2701.11 ("Anthracite Coal, Whether or Not Pulverized, But Not Agglomerated").  Surrogate

Values for the Preliminary Results at 4, PD 266–67 (May 16, 2014) ("Preliminary SV Memo");

see also Pet'rs' Surrogate Values for the Preliminary Results at Ex. 2A, PD 161–65 (Nov. 20,

2013) ("Pet'rs SV Cmts.").

        In the Final Results, Commerce departed from its decision in the Preliminary Results to

value anthracite coal at $1.19 per kilogram based on POR6-contemporaneous Philippine GTA

data.  Certain Activated Carbon from the People's Republic of China:  Issues and Decision

Memorandum for the Final Results of the Sixth Antidumping Duty Administrative Review at

37–38, A-570-904, (Nov. 18, 2014), available at http://enforcement.trade.gov/frn/

summary/prc/2014-27926-1.pdf (last visited Jan. 6, 2016) ("I&D Memo").  Instead, Commerce

relied on the SV derived from Philippine GTA data used in the fifth administrative review, which

is data that was contemporaneous with the fifth POR ("POR5-contemporaneous"), rather than on

an SV derived from data contemporaneous with the present POR.  Id.  Commerce noted that "no

parties contested that SV in the previous review."  Id.  The new SV relied upon in the Final

Results was $0.05 per kilogram, Surrogate Values for the Final Results at Attach. 1, PD 314

(Nov. 18, 2014), which was then "inflated to the current POR using Philippine producer price

index information[,]" I&D Memo at 38.  In so doing, Commerce rejected petitioners' arguments

that the POR6-contemporaneous Philippine GTA data should be used or alternatively "an

average of the anthracite coal SVs from Indonesia, Thailand, and Colombia," determining that

the POR6-contemporaneous Philippine GTA data was not specific to the type of anthracite coal

used by the mandatory respondents.  Id. at 35–37.  Commerce relied on publically available data

from two trade information services, Port Import/Export Reporting Service ("PIERS") and

ZEPOL Corporation ("ZEPOL"), to find that 94 percent of the POR6-contemporaneous

Philippine GTA data was filtration anthracite (called "Leopold Underdrain" and produced by

Xylem, Inc. ("Xylem")), which Commerce concluded is different from the bulk anthracite coal

consumed by the respondents.  Id. at 31–32, 35.  Commerce also rejected arguments by certain

respondents that U.S. Energy Information Association ("EIA") data, which provides United

States domestic prices, should be used to value anthracite coal, because Commerce's preference

is to use surrogate data from countries at a level of economic development comparable to that of

the NME country.  Id. at 36.

        As a result, on November 25, 2014, Commerce published its Final Results, assigning AD

duty rates of $0.04 per kilogram to Jacobi, $0.04 per kilogram to Cherishmet, $0.04 per kilogram

to exporters separate from the PRC-wide entity (the "all-others rate"), and $2.42 per kilogram to

the PRC-wide entity.  Final Results, 79 Fed. Reg. at 70,165.  Those rates represented a change

from the Preliminary Results, in which Commerce assigned AD duty rates of $3.77 per kilogram

to Jacobi, $2.05 per kilogram to Cherishmet, $3.13 per kilogram as the all-others rate, and $2.42

per kilogram to the PRC-wide entity.[4]  Preliminary Results, 79 Fed. Reg. at 29,420.  With regard

to the separate rate status of certain respondents, Commerce stated in the Final Results that it

"ha[d] received no comments or argument since the issuance of the Preliminary Results that

---

[4] In the Preliminary Results, Commerce noted that in the second administrative review it had
"determined that it would calculate per-unit assessment and cash deposit rates for all future
reviews," rather than ad valorem rates.  Certain Activated Carbon from the People's Republic of
China:  Preliminary Results of Antidumping Duty Administrative Review; 2012-2013, 79 Fed.
Reg. 29,419, 29,420 n.2 (Dep't Commerce May 22, 2014) ("Preliminary Results").

provides a basis for reconsideration." Id. at 70,164.  As a result, it continued to find that "[t]he

PRC-wide entity includes Shanxi DMD Corporation and Tangshan Solid Carbon Co., Ltd." Id.

at 70,164 n.26; see also Preliminary Results, 79 Fed. Reg. at 29,420 n.5.

In the present appeal, CAC challenges Commerce's Final Results on several grounds.

First, CAC argues that Commerce's policy in AD proceedings to presume that all exporters in

the PRC are under state control is arbitrary and capricious in the light of its treatment of the PRC

in countervailing duty ("CVD") cases and that Commerce's presumption of state control was

unsupported by substantial evidence in this review.  Consol. Pl. Carbon Activated Corp. Mem. in

Supp. of Mot. for J. on the Agency R. 8–14, ECF No. 53-2 ("CAC Br.").  Second, CAC

challenges the AD duty rate, which was the PRC-wide rate, assigned to Shanxi DMD as not

supported by substantial evidence because Shanxi DMD is entitled to the all-others rate.[5]  Id. at

14–16.  Third, CAC argues that the rate assigned to Shanxi DMD was punitive and not reflective

of Shanxi DMD's commercial reality.  Id. at 16–18.[6]

The government and petitioners respond that CAC failed to exhaust the entirety of its

arguments at the administrative level.   Def.'s Opp'n to Mots. For J. upon the Agency R. 11–23,

ECF No. 66 ("Gov. Br."); Domestic Industry's Resp. in Opp'n to Consol. Pl.'s Mot. for J. on the

---

[5] CAC also argues that Commerce's assignment of the PRC-wide rate to Shanxi DMD is not in
accordance with 19 U.S.C. § 1673d(c)(5), the provision which defines the all-others rate.
Consol. Pl. Carbon Activated Corp. Mem. in Supp. of Mot. for J. on the Agency R. 14, ECF No.
53-2 ("CAC Br.").  This argument appears to misconstrue the nature of the rate assigned to the
PRC-wide entity, which received its own specific rate and not the all-others rate.  In any event, to
the extent that CAC is asserting something different, its argument is underdeveloped and
unexplained.

[6] CAC also argues that Commerce's application of a dollar per kilogram assessment rate, rather
than an ad valorem rate as a remedy for potential duty absorption, was unlawful because
Commerce did not perform a duty absorption analysis under 19 U.S.C. § 1675(a)(4).  CAC Br. at
19–20.

Agency R. 1–7, ECF No. 65 ("Pet'rs Resp. Br.").  CAC contends that it cannot be charged with

failure to exhaust its arguments because of the change to the all-others rate from $3.13 per

kilogram in the <u>Preliminary Results,</u> which would have been adverse for CAC, to $0.04 per

kilogram in the <u>Final Results,</u> which would have been advantageous.  Reply of Carbon Activated

Corp. 1–6, ECF No. 79 ("CAC Reply Br.").

Petitioners challenge Commerce's <u>Final Results</u> based on Commerce's selection of the

SV derived from POR5-contemporaneous Philippine GTA data for anthracite coal, arguing that

the resulting value is aberrantly low and that the POR6-contemporaneous Philippine GTA data

or data from another economically comparable country should have been used.  Mem. of Law in

Supp. of Pls.' Mot. for J. on the Agency R. 18–37, ECF No. 52-1 ("Pet'rs Br.").  The

government, supported by defendant-intervenors, responds that the selection of the SV for

anthracite coal derived from POR5-contemporaneous Philippine GTA data was proper because

that resulting value is not aberrational, the POR6-contemporaneous Philippine GTA data were

not specific to the anthracite coal used by the mandatory respondents, and the decision aligned

with Commerce's policy of selecting SVs from one primary surrogate country.  Gov. Br. at 28–

42; Def.-Intvnr. Jacobi Carbons' Resp. to Calgon Carbon Corp. and Cabot Norit Americas' Br.

in Supp. of Their Mot. for J. on the Agency R. 1–13, ECF No. 67 ("Jacobi Resp. Br.");

Cherishmet's Opp'n to Pls.' Rule 56.2 Mot. for J. upon the Agency R. 9–30, ECF No. 68

("Cherishmet Resp. Br."); Resp. Br. of Def.-Intvnrs. in Opp'n to Pls.' Rule 56.2 Mot. for J. upon

the Agency R. 12–26, 30–37, ECF No. 64 ("Albemarle and Huahui Resp. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Commerce's final results in

an administrative review of an AD duty order are upheld unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

**DISCUSSION**

## I.    Exhaustion of Administrative Remedies and CAC's Appeal

The government and petitioners argue that CAC was required to exhaust the entirety of

its arguments at the administrative level, failed to do so, and that none of the recognized

exceptions to the exhaustion requirement excuse CAC's actions in this case.  Gov. Br. at 9–26;

Pet'rs Resp. Br. at 1–7.[7]  The government and petitioners strangely do not address the merits of

CAC's appeal, presumably unjustifiably confident that CAC may be charged with failure to

exhaust its administrative remedies.  CAC concedes that it did not challenge, in its administrative

case brief, the finding of state-ownership or the resulting rate assigned to Shanxi DMD after the

Preliminary Results.  See CAC Reply Br. at 1.  CAC, however, claims that the doctrine of

exhaustion does not apply because, relative to the rates assigned to the mandatory respondents

and the all-others rate, Shanxi DMD received a more favorable rate in the Preliminary Results

and was therefore not required to act against its interests by filing a brief contesting Shanxi

DMD's PRC entity-based rate.  Id. at 4–10.

---

[7] The government argues that CAC is barred from arguing in its reply brief that exceptions to the
exhaustion doctrine apply, because CAC's opening brief accompanying its Rule 56.2 motion
does not acknowledge that it failed to exhaust its arguments at the administrative level or list
which exceptions to exhaustion apply.  Def.'s Opp'n to Mots. For J. upon the Agency R. 13,
ECF No. 66 (citing Corus Staal BV v. United States, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007)).
The argument is without merit.  As CAC correctly notes, before this court exhaustion is a
defense that should be raised by the defendant.  CAC Reply Br. at 12–13.  The government's
citation, to a situation where an appellant at the Court of Appeals for the Federal Circuit failed to
raise a new exception to the exhaustion doctrine in its reply brief, is not applicable here.  See
Corus Staal, 502 F.3d at 1378 n.4.

Congress has granted the court discretion to "where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d); see Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1196 (2004) (recognizing that Congress' inclusion of the phrase "where appropriate" grants the court discretion, thereby clarifying that the exhaustion requirement is not jurisdictional).  The exhaustion doctrine provides "that no one is entitled to judicial relief . . . until the prescribed administrative remedy has been exhausted."  Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (quoting Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998)).

The government incorrectly believes that CAC had a full opportunity to challenge the PRC-wide rate at the administrative level because the rate was unchanged from the Preliminary Results to the Final Results.  See Gov. Br. at 19.  The government looks to the PRC-wide rate in a vacuum and fails to consider the actual context (i.e., the other rates) in which CAC determined whether it was appropriate for it to challenge the rate assigned in the Preliminary Results.  It was reasonable for CAC to rely on the rates assigned in the Preliminary Results to determine what arguments to include in its administrative case brief.  See Qingdao Taifa Grp. Co. v. United States, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1236–37 (2009).  For instance, in Qingdao Taifa, Taifa's rate increased from 3.82% in the preliminary results to 383.60% in the final results, because Commerce applied adverse facts available.  Id.  The court held that Taifa did not fail to exhaust because it was able to rely on Commerce's preliminary results.  See id. at 1092–93, 1236–37 ("Taifa is not required to predict that Commerce would accept other parties' arguments and change its decision.").  There is no support for the contention that an interested party in CAC's position is required to challenge the application of a more favorable rate and make arguments that it should have a less favorable rate.  Indeed, CAC was not required to

anticipate that Commerce would accept certain arguments resulting in a drastic decrease in other companies' rates.  See Boomerang Tube LLC v. United States, Slip Op. 15-140, 2015 WL 9272840, at *4 (CIT Dec. 17, 2015) (refusing "to conclude that plaintiffs should have predicted that Commerce might accept [an interested party's constructed value profit argument] . . . and should have raised, in their case briefs, potential arguments against that possibility.").[8]

CIT Rule 56.2 states that "the briefs submitted on the motion . . . [including those] supporting the agency determination, must include . . . the issues of law presented together with the reasons for . . . supporting the administrative determination . . . [and] must include the authorities relied on and the conclusions of law deemed warranted by the authorities."  USCIT R. 56.2(c)(1)–(2).  The government and petitioners, in their response briefs, chose not to address the merits of CAC's arguments, which were raised by CAC in its opening brief supporting its CIT Rule 56.2 motion.  Any argument, therefore, defending Commerce's selection of a $2.42 per kilogram rate to Shanxi DMD, is waived, as CAC claimed in its reply brief.  See United States v. Great Am. Ins. Co. of New York, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); cf. Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th Cir. 2000) (affirming a grant of summary judgment based on waiver and recognizing that the non-moving party failed to make

---

[8] The court notes, however, that CAC was required to exhaust its argument regarding Commerce's application of a dollar per kilogram assessment rate.  See CAC Br. at 19–20.  In the Preliminary Results, Commerce calculated dollar per kilogram assessment rates for all exporters, including those found to be within the PRC-wide entity.  See Preliminary Results, 79 Fed. Reg. at 29,420.  Commerce has instituted this same methodology since the second administrative review of certain activated carbon.  Id. at 29,420 n.2.  Unlike with CAC's other challenges to Commerce's Final Results, CAC was equally incentivized in both the Preliminary Results and the Final Results to challenge Commerce's application of a dollar per kilogram rate and should have done so in an administrative case brief.

certain arguments in its opposition brief).  The government and petitioners had ample

opportunity to address the arguments CAC made in its opening brief, but they made a decision

not to do so.[9]  It would not be proper to allow these parties, after full briefing and oral argument,

the belated opportunity to defend their position or address CAC's arguments on the merits.

Further, Commerce and petitioners do not seem to desire that opportunity.  That is, the court

permitted the parties two weeks in which they could have taken some action to demonstrate no

intentional waiver, after the court opined at oral argument that there appeared to be waiver.  The

parties did not seek to file supplemental briefs or request remand to address the merits.  Rather,

the parties advised that nothing was conceded and the court should decide the matter as it stood.

See Status Report, ECF No. 88.  Thus, while in some cases the proper procedure may be for the

---

[9] The government and the petitioners filed their response briefs on July 29, 2015, or seventy-one days after CAC filed its opening brief on May 19, 2015.  Notably, CAC's amended complaint raising these very issues was deemed filed on June 18, 2015, or forty-one days prior to the date the government and petitioners filed their response briefs.  See Second Am. Compl., ECF No. 61.  The government's opposition to amendment on failure to exhaust grounds was not successful.  See Def.'s Resp. in Opp'n to Pl.'s Mot. for Leave to Amend its Compl., ECF No. 57. The court granted CAC's motion to amend its complaint.  Order, ECF No. 60.  The court did so for various reasons, including:  (1) there was no prejudice because there was ample time to brief the key issues, see Pl.'s Partial Consent Mot. to Amend Compl. a Second Time 2, ECF No. 51 ("CAC's Mot. to Amend Compl."); (2) although the government opposed amendment based on exhaustion, the exhaustion issue was not likely to be resolved in its favor, see Resp. to Ct. Order re Exhaustion of Remedies 3–9, ECF No. 59 ("CAC's Exhaustion Resp."); (3) generally, unfair trade cases do not require carefully drawn factual allegations, so pleadings are not usually of importance (e.g., because an answer is not required), see CAC's Mot. to Amend Compl. at 2; and (4) a CIT Rule 15 amendment is favored and doubly so when Commerce's policy of issuing liquidation instructions fifteen days after a determination, when the statute allows thirty days to file a summons and sixty days to file a complaint, 19 U.S.C. § 1516a(a)(2), forces plaintiffs to decide too quickly on their claims, see CAC's Exhaustion Resp. at 11.  Neither the government nor petitioners ever sought an extension of time to file their response briefs after CAC filed its 56.2 brief or its amended complaint.  Thus, it appears both parties intentionally (or perhaps strategically) chose not to challenge the merits of CAC's arguments.

court <u>sua sponte</u> to order the agency to address the new matter, the court does not find that

course appropriate where all sides to the controversy do not desire it.

Here, CAC's opening brief successfully argues that the presumption of state control was

unsupported by substantial evidence in this case, pointing to Commerce's inconsistent practice in

CVD cases involving the PRC and an internal Commerce memorandum noting in part that

"market forces now determine the prices of more than 90 percent of products traded in China."

CAC Br. at 8–14 (quoting Countervailing Duty Investigation of Coated Free Sheet Paper from

the People's Republic of China – Whether the Analytical Elements of the <u>Georgetown Steel</u>

Opinion are Applicable to China's Present-Day Economy at 5, C-570-907, (Mar. 29, 2007),

<u>available at</u> http://enforcement.trade.gov/download/nme-sep-rates/prc-cfsp/china-cfs-

georgetown-applicability.pdf (last visited Jan. 7, 2016)).  The government and petitioners,

alternatively, have not provided the court with any merits-based argument, legal or factual, to

review, thereby abandoning any such arguments.  The record is devoid of any evidence, let alone

substantial evidence, supporting Commerce's presumption of state control in this case, and the

government further does not even attempt to remedy this deficiency by requesting a remand to

supplement the record or to address CAC's claims.  Thus, not only did CAC not have an

opportunity to exhaust administrative remedies, but also CAC is correct that Commerce's <u>Final</u>

<u>Results</u> are not supported by substantial evidence.  This is not to say that, in a future review or in

another case, Commerce could not make the proper showing to justify its continued presumption

of state control even in contemporary circumstances, such as by placing the necessary evidence

on the record or offering appropriate argument.  The government simply chose not to seek the opportunity to do so here.[10]

Commerce, on remand, shall assign Shanxi DMD the all-others rate.  Such treatment of Shanxi DMD is not inequitable or unreasonable, given that in the fifth and seventh reviews (i.e., the reviews immediately preceding and following the present review) Shanxi DMD was treated as separate from the PRC-wide entity and was assigned the all-others rate.[11]  See Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014, 80 Fed. Reg. 61,172, 61,174 (Dep't Commerce Oct. 9, 2015); Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2011-2012, 78 Fed. Reg. 70,533, 70,535 (Dep't Commerce Nov. 26, 2013).

## II.    Commerce's Selection of a Surrogate Value for Anthracite Coal

Petitioners challenge Commerce's selection of the $0.05 per kilogram value for anthracite coal derived from the POR5-contemporaneous Philippine GTA data, arguing that Commerce improperly disregarded the $1.19 per kilogram value derived from POR6-contemporaneous Philippine GTA data as not product specific, that Commerce should have used a contemporaneous value, and that the $0.05 per kilogram value was aberrational.  Pet'rs Br. 18–

---

[10] Because the court decides in favor of CAC on its argument that the presumption of state control in this case was unsupported by substantial evidence, thereby affording CAC the relief it desires by assigning its exporter, Shanxi DMD, the all-others rate, CAC's argument that the PRC-wide rate was aberrant and punitive is moot.  See CAC Br. at 16–18.

[11] Instead, given Shanxi DMD's designation as separate from the PRC-wide entity in both the fifth and seventh reviews, its failure to file a separate rate certification in the sixth review appears to be, if anything, a technical failure.  Such a technical failure may justify assignment of a PRC-wide rate where Commerce's procedure, based on a supported presumption, is upheld.  This is not such a case.

37.  The government and defendant-intervenors refute each of petitioner's arguments, contending that Commerce properly rejected the value derived from the POR6-contemporaneous Philippine GTA data and selected the value derived from POR5-contemporaneous Philippine GTA data. Gov. Br. at 28–42; Jacobi Resp. Br. at 2–13; Cherishmet Resp. Br. at 10–30; Albemarle and Huahui at 12–37.

When valuing FOPs, Commerce is required to use the "best available information" from, to the extent possible, "one or more" surrogate ME countries.  19 U.S.C. § 1677b(c)(1), (4). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  Commerce's discretion, however, is limited by the statute's objective of "obtain[ing] the most accurate dumping margins possible," meaning Commerce's choice of the best available information "must evidence a rational and reasonable relationship to the factor of production it represents" to be supported by substantial evidence.  Hebei Metals, 28 CIT at 1191.

Commerce's practice is, to the extent practicable, to select SVs that are (1) publicly available, (2) specific to the input to be valued, (3) reflective of broad market averages, (4) contemporaneous with the POR, and (5) tax and duty exclusive.  Qingdao Sea-Line, 766 F.3d at 1386; QVD Food Co. v. United States, 34 CIT 1166, 1168, 721 F. Supp. 2d 1311, 1315 (2010), aff'd, 658 F.3d 1318 (Fed. Cir. 2011); see also I&D Memo at 34.  Commerce's stated preference is "to satisfy the breadth of the aforementioned selection criteria."  I&D Memo at 34. On review, the court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information."  Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d

1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431

F. Supp. 2d 1323, 1327 (2006)).

A.      Product Specificity

Petitioners contend that the filtration anthracite, on which the POR6-contemporaneous

Philippine GTA data is based, is the type of anthracite coal consumed by the mandatory

respondents, both of which are crushed and sorted.  Pet'rs Br. at 27–28; Pls.' Reply Br. at 3–11,

ECF No. 80 ("Pet'rs Reply Br.").  Petitioners argue that the two products are physically similar,

that Commerce's conclusory finding that the filtration anthracite is "processed" is insufficient to

differentiate the two, and that Commerce's reliance on end-use applications is improper.  Pet'rs

Br. at 29–31.

The government and Cherishmet respond that the POR6-contemporaneous Philippine

value was based on two entries and the PIERS and ZEPOL data confirmed that 94 percent of the

entries were filtration anthracite coal, which is not the type of bulk anthracite coal used by the

mandatory respondents.  Gov. Br. at 35–36; Cherishmet Resp. Br. at 18–22.  The government

contends that Commerce made this determination based on the facts that 87,090 kilograms of the

product were entries of Leopold Underdrain by Xylem and that record evidence showed that

Leopold Underdrain is a "filter product made from anthracite . . . processed to produce a 'low

uniformity coefficient' to extend the life and efficiency of water filters."  Gov. Br. at 36 (quoting

I&D Memo at 35–36).  Jacobi argues that product specificity should be evaluated before other

SV factors, Jacobi Resp. Br. at 4, and argues that its certified questionnaire responses and both

the test reports and photographs provided by its suppliers all show that its suppliers used only

generic anthracite coal (i.e., raw lump anthracite coal from the mine), id. at 5–8; see also Gov.

Br. at 38.  Albemarle and Huahui similarly argue that Commerce "undertook a detailed analysis

in concluding that the filtration anthracite was not specific to the anthracite coal consumed by the

respondents," that no record evidence detracts from Commerce's conclusion regarding the

Leopold Underdrain product, and that Commerce was not required to speculate on potential

similarities.  Albemarle and Huahui Resp. Br. at 14–15.

As a preliminary matter, Commerce properly determined, after consulting the PIERS and

ZEPOL data, that 94 percent (i.e., 87,090 kilograms) of POR6-contemporaneous Philippine GTA

data consisted of one entry of Leopold Underdrain, produced by Xylem.  Compare Preliminary

SV Memo at Attach. 2a, with Jacobi's Surrogate Value Cmts. Ex. SV-3 at 71, PD 135–51 (Nov.

20, 2013)[12] ("Jacobi's SV Cmts."), and Cherishmet's Surrogate Value Ex. 3B, PD 152–60 (Nov.

20, 2013) ("Cherishmet's SV Cmts.").  It was reasonable for Commerce in this case to rely on

the PIERS and ZEPOL data to identify the specific entry because both sets of data identified the

exact same quantity as the POR6-contemporaneous Philippine GTA data for the single entry by

Xylem.  See I&D Memo at 35.

Commerce's decision to reject the POR6-contemporaneous Philippine GTA data, as "not

bulk anthracite coal used by the respondents, but a processed anthracite product," was supported

by substantial evidence on the record.  I&D Memo at 35.  In determining that filtration anthracite

is a different product, Commerce explained that the

> information placed on the record by Cherishmet and Jacobi indicates that this
> [Leopold] product has no relation to the production of activated carbon and is a
> different product than the bulk anthracite coal used by respondents.  Specifically,
> information on the record indicates that the Leopold product is produced from
> anthracite coal which has been processed to produce a "low-uniformity coefficient"
> to extend the life and efficiency of water filters. . . . Further, record evidence

---

[12] The page numbers referenced in citations to Jacobi's November 20, 2013 Surrogate Value
Comments Exhibit SV-3 are based on the page numbers listed in the version of Jacobi's exhibit
included in petitioners' appendix.  See App. to Pls.' Mem. of Law in Supp. of Mot. for J. on the
Agency R. 107–312, ECF No. 54–54-2.

demonstrates that the Leopold product is unrelated to the production of activated
carbon.

Id. at 35–36 (footnotes omitted).  Jacobi and Cherishmet submitted information from Xylem

"where product information explains that Leopold Underdrain is used to improve water drainage,

water filtering and is manufactured to specific utility coefficients."  I&D Memo at 35 & n.139

(citing Jacobi's SV Cmts. Ex. SV-3; Cherishmet's SV Cmts. Ex. 3B), 36 n.144 (citing Jacobi's

SV Cmts. Ex. SV-3; Cherishmet's SV Cmts. Ex. 3C).

        The record supports Commerce's determination that the mandatory respondents used raw

or bulk anthracite coal as an input in the production of activated carbon.  Jacobi's certified

questionnaire demonstrates that one of its suppliers starts with "raw lump anthracite coal from

the mine," which then undergoes the following stages:  carbonization, activation,

sieving/crushing, and acid washing/impregnation.  Jacobi's Resp. to the Department's Suppl.

Sec. D Quest. for Ningxia Huahui Activated Carbon Co., Ltd. 2–3, PD 233 (Feb. 12, 2014)

("Jacobi's Suppl. Sec. D Resp.").  That supplier indicated that "products destined for Jacobi do

not have complex packing materials.  Instead they are simply poured into bulk sacks and shipped

to Jacobi in Tianjin."  Id. at 3.  Jacobi's other supplier, similarly, starts with "anthracite and

energy (lump) coal," continues "by crushing the coal," which is then "mixed with tar and water

and pressed into pellets . . . [and] placed in a kiln and heated to produce carbonized material,"

before being activated.  Jacobi's Resp. to the Department's Sec. D Quest. D-4, PD 104 (Aug. 23,

2013) ("Jacobi Sec. D. Resp.").  Depending on customer specifications, the final activated

carbon may be "sieved into different granular or pellet sized products," "washed by acid solution

or impregnated with chemicals," and packaged.  Id. at D-5.  Cherishmet, the other mandatory

respondent, also reported that "[n]ormally" its activated carbon "is processed from anthracite

coal through grinding, mixing/extruding, carbonization, activation and screening." Cherishmet

Resp. to Sec. C & D Quest. 3–4, PD 114 (Sept. 3, 2013) ("Cherishmet's Sec. C & D Resp.").[13]

The record also supports Commerce's determination that the Xylem filtration anthracite

media is a more processed product, designed for end-use, rather than the raw material used by

the respondents. The PIERS and ZEPOL data provide that Xylem exported Leopold Underdrain,

specifically "64 Pkgs of Filter Anthracite," from the United States into the Philippines. Jacobi's

SV Cmts. Ex. SV-3 at 71; Cherishmet's SV Cmts. Ex. 3B. Xylem's own product information

states that "Leopold Engineered Filter Media anthracite is produced from the highest quality

anthracite available to assure the physical characteristics of hardness, durability, and

performance. We purchase our feedstock directly from select mines chosen for the quality of

their anthracite." Jacobi's SV Cmts. Ex. SV-3 at 81. Then, the filter anthracite is "processed in

a unique, state-of-the-art facility specifically designed to produce low-UC [uniformity

coefficient] filter media." Id. Xylem even "[r]educe[s] the moisture in the raw feedstock . . . to

produce ten distinct anthracite media sizes." Id. Xylem undergoes this process so that its filter

anthracite media may achieve "[s]uperior filtration qualities, [i]ncreased filter run volumes, and

[r]equires less water to thoroughly backwash." Cherishmet's SV Cmts. Ex. 3C at 9. In fact,

Xylem's Leopold product is designed to meet or exceed the American Water Works Association

("AWWA") requirements for granular filter products. Jacobi SV Cmts. Ex. SV-3 at 81.

Therefore, it is clear from the record that Xylem's product is of a high-grade and is processed to

be ready to achieve certain filtration-specific results. It was reasonable, then, for Commerce to

infer from this record evidence that such a processed product is not the same as the raw or bulk

---

[13] Cherishmet did not provide more information on its anthracite input. Much of the analysis in the parties' briefs focuses on the differences between Xylem's product and Jacobi's input.

product used by respondents.  Indeed, Commerce explicitly based its decision that the Leopold

product is a "processed anthracite product," on its statement that "product information explains

that Leopold Underdrain is used to improve water drainage, water filtering and is manufactured

to specific utility coefficients."  I&D Memo at 35 & n.139, 36 n.144.

The petitioners argue that consideration of applications in which the Xylem product is

used is "irrelevant to the physical comparability" of the two products and should be disregarded.

Pet'rs Br. at 31.  Consideration of applications in which the two products are used is relevant, in

so far as it speaks to whether one product is the type of product that a foreign producer of

activated carbon would use in its production process.  A product too far downstream in the

production process, as appears to be the case here, may not be substitutable for a raw material,

e.g., due to a prohibitively high cost of the input.  Petitioners argue only that the products are

physically comparable because "both . . . involve crushed anthracite coal that has been sorted to

size."  Pet'rs Reply Br. at 10.  The record does not indicate that the respondents' lump coal

undergoes a crushing or sorting process similar to Xylem's, which is specifically designed to

achieve a low-uniformity coefficient.  See Jacobi's SV Cmts. Ex. SV-3 at 81.  Regardless,

petitioner's argument is insufficient, in this case, to conclude that Commerce's decision is

unsupported by substantial evidence as there is ample record evidence supporting Commerce's

determination that the Xylem product is a downstream processed product and not the input

product at issue here.

B.    Anthracite Coal Value from the Fifth Period of Review

Petitioners also argue that Commerce should have relied on POR6-contemporaneous data

from the other countries found to be economically comparable to the PRC, challenging

Commerce's seemingly unyielding preference for selecting SVs from a single, primary surrogate

country.  Pet'rs Br. at 31–36.  Petitioners contend that because the average unit value of

anthracite coal undergoes "significant fluctuations" year-to-year, it is even more important for

Commerce to select a POR-contemporaneous value rather than trying to select all SVs from the

same surrogate ME country, the Philippines.  Id. at 33–36.

     The government responds that Commerce is not required to select a POR-

contemporaneous value over its preferred method of selecting SVs from the same primary

surrogate country.  Gov. Br. at 39–42; see also Albemarle and Huahui Resp Br. at 22–26.  The

government also contends that Commerce's use of an inflator to the POR5-contemporaneous

Philippine GTA data was sufficient to address the petitioners' concerns regarding yearly

fluctuations and the fluctuations are likely due to the fact that the values are based on different

types of coal.  Gov. Br. at 40–42.  Moreover, Cherishmet, as well as Albemarle and Huahui,

submit that the Indonesian, Thai, and Colombian GTA data, which are all POR6-

contemporaneous, are all unreliable.  Cherishmet Resp. Br. at 27–30; Albemarle and Huahui

Resp. Br. at 18–22.  Albemarle and Huahui also argue that Commerce's rejection of the POR6-

contemporaneous data from the other economically comparable countries was proper because it

determined that the SV derived from the POR5-contemporaneous Philippine GTA data was

reliable.  Albemarle and Huahui Resp. Br. at 17–18.

     Commerce has promulgated a regulation providing that "the Secretary normally will

value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).  This "preference,"

however, carries the day only when it is used to "support a choice of data as the best available

information where the other available data 'upon a fair comparison, are otherwise seen to be

fairly equal.'"  Peer Bearing Co.-Changshan v. United States, 804 F. Supp. 2d 1337, 1353 (CIT

2011) (quoting Peer Bearing Co.-Changshan v. United States, 752 F. Supp. 2d 1353, 1373 (CIT

2011)).

Commerce, by relying on its single surrogate country preference and nothing more,

improperly rejected other SVs for anthracite coal derived from POR6-contemporaneous data

from other countries.  First, the POR5-contemporaneous Philippine GTA data cannot be said on

this record to be "fairly equal" to the POR6-contemporaneous GTA data from these other

countries because it is not contemporaneous with the POR.  Even Commerce has acknowledged

that one of the five factors that helps determine the best available information to factor FOPs is

whether the data are contemporaneous with the POR.  See I&D Memo at 38; Qingdao, 766 F.3d

at 1386.  The need for Commerce to apply an inflator to the POR5-contemporaneous Philippine

GTA data to adjust the old data to reflect POR6 prices demonstrates that non-contemporaneous

data is not ipso facto equal to contemporaneous data.  Second, the POR5-contemporaneous

Philippine GTA data may not be as reliable as some of the POR6-contemporaneous GTA data

from other countries.  There is no supporting data on the record of this review for the POR5-

contemporaneous Philippine value.  Commerce simply imported the SV wholesale from the

earlier review.  Effectively, the selection is unreviewable.  Publically available information,

however, shows that the POR5-contemporaneous Philippine value of $0.05 per kilogram was

derived from just slightly more than 160,000 kilograms of imports.  See Fifth Administrative

Review of Certain Activated Carbon from the People's Republic of China:  Surrogate Values for

the Preliminary Results at 4 & Attachs. 1, 2a–2b, A-570-904, (May 2, 2013) (ACCESS bar code

3135971-01).  Some of the other values on the record, such as the values for South Africa (over

80,000,000 kilograms) and the Ukraine (nearly 15,000,000 kilograms), are based on much higher

quantities of imports and thereby likely provide more reliable data upon which to calculate an

SV.  Cherishmet's SV Cmts. at Exs. 3D–3E.  As indicated, Commerce did not place information

on the record relating to the POR5-contemporaneous Philippine GTA data.

Because it relied on a single country surrogate, Commerce never addressed the reliability

of the POR6-contemporaneous record GTA data for anthracite coal from Indonesia, Colombia,

Thailand, or South Africa, all four of which were determined by Commerce to be at a

comparable level of economic development as the PRC.  See Commerce's Letter re: Deadlines

for Surrogate Country and Surrogate Value Cmts. at 1–3, PD 73 (Aug. 2, 2013); see also Pet'rs

SV Cmts. at Ex. 2A (Indonesia); Pet'rs' Final Submission of Surrogate Value Data at Attach.,

PD 258 (Apr. 21, 2014) (Thailand and Colombia); Cherishmet's SV Cmts. at Ex. 3E (South

Africa).[14]  Commerce also did not address the reliability of POR6-contemporaneous Ukrainian

data, which was on the record, Cherishmet's SV Cmts. at Exs. 3D, 3G, along with information

comparing Ukraine's level of economic development to the PRC's, id. at Ex. 3J.[15]  Commerce

rejected these data only stating that it "has a demonstrated preference of valuing inputs using

data from the primary surrogate country," I&D Memo at 37–38, but as indicated the preference

on its own is not a sufficient reason to reject superior data.  See Peer Bearing, 804 F. Supp. 2d at

1353.  Instead, here Commerce was required to explain based on the record evidence why it

rejected such data before selecting the SV derived from the POR5-contemporaneous Philippine

GTA data, assuming such a value can be adequately supported.

---

[14] It is possible that these data suffer from usability or reliability concerns, but such concerns
have not yet been addressed by Commerce.

[15] The court is not in a position to decide whether Ukraine is at a similar level of economic
development as the PRC and what impact a negative finding would have.  Depending on what
other information is usable, Commerce may have to address this issue.

Although the government asserts that using a methodology, in which Commerce selects SVs from different surrogate countries, may cause distortion in constructing normal value, it is hard to believe that such a distortion, if any at all, would be equal to or more significant than the distortion caused by not using contemporaneous SVs here.[16]  Thus, Commerce improperly selected the SV derived from the POR5-contemporaneous Philippine GTA data (1) without placing any of the underlying data on the record to support the value and (2) without addressing contemporaneous surrogate data on the record from non-primary surrogate country sources.[17]

---

[16] At oral argument, the parties acknowledged that surrogate financial ratios account for one of the largest factors in constructing normal value, but the financial ratios used are not based on data from the POR.  In this review, Commerce relied on the financials of five Philippine companies to calculate average surrogate financial ratios.  Certain Activated Carbon from the People's Republic of China:  Issues and Decision Memorandum for the Final Results of the Sixth Antidumping Duty Administrative Review at 39, 42, A-570-904, (Nov. 18, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-27926-1.pdf (last visited Jan. 6, 2016).  Four of those companies' financials covered "the period ending 12/31/2012" and the fifth covered "the period ending 6/3/2012," representing periods that do not perfectly overlap with the POR of April 2012 to March 2013.  See Surrogate Values for the Preliminary Results at Attach. 6, PD 266–67 (May 16, 2014).  Therefore, the government's concern about potential slight distortions from using non-Philippine data is unwarranted and fails to acknowledge the imperfections in Commerce's methodology due to time-based distortions.

[17] Because the court has determined that Commerce, in relying only on its preference for a primary surrogate country, improperly selected the non-contemporaneous $0.05 per kilogram value, the court does not need to reach petitioners' argument that the value was aberrantly low.  See Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. 18–26, ECF No. 52-1.  As the court noted, however, there is nothing in this record to support the value.  In conducting its redetermination, Commerce should carefully consider Cherishmet's and Albemarle and Huahui's arguments impeaching the reliability of the data from Indonesia, Thailand, and Colombia.  See Cherishmet's Opp'n to Pls.' Rule 56.2 Mot. for J. upon the Agency R. 27–30, ECF No. 68; Resp. Br. of Def.-Intvnrs. in Opp'n to Pls.' Rule 56.2 Mot. for J. upon the Agency R. 18–22, ECF No. 64.  Commerce should disregard unreliable data and rely only on record data that promotes the statute's goal of calculating the most accurate dumping margins by using the best available information.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Final Results</u> are remanded for Commerce to assign Shanxi DMD the all-others rate.  In addition, Commerce shall reconsider its selection of an SV for anthracite coal, in accordance with this opinion.  Commerce shall have until March 21, 2016, to file its remand results.  The parties shall have until April 20, 2016, to file objections, and the government shall have until May 4, 2016, to file its response.

    /s/ Jane A. Restani    
Jane A. Restani
Judge

Dated: January 20, 2016
      New York, New York