Slip Op. 16-107

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CALGON CARBON CORPORATION, and CABOT NORIT AMERICAS, INC.,** | |
| Plaintiffs, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 14-00326** |
| Defendant, | |
| **ALBEMARLE CORPORATION, NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON COMPANY, LTD., CARBON ACTIVATED CORPORATION, JACOBI CARBONS AB, and JACOBI CARBONS, INC.,** | |
| Defendant-Intervenors. | |

## OPINION

[Commerce's final results of redetermination in antidumping duty periodic review sustained in part and remanded in part.]

Dated: November 18, 2016

David A. Hartquist, John M. Herrmann II, Melissa M. Brewer, and R. Alan Luberda, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiffs.

Peter A. Gwynne, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Michael T. Gagain, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, DC, for defendant-intervenors Albemarle Corporation and Ningxia Huahui Activated Carbon Co., Ltd.

Francis J. Sailer and Dharmendra N. Choudary, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for defendant-intervenor Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenor Carbon Activated Corporation.

Daniel L. Porter, Claudia D. Hartleben, and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for defendant-intervenors Jacobi Carbons AB and Jacobi Carbons, Inc.

Restani, Judge:  Before the court are the Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, ECF No. 97 ("Remand Results"), concerning the sixth annual administrative review of the antidumping ("AD") duty order on certain activated carbon from the People's Republic of China ("PRC").  See Notice of Antidumping Duty Order:  Certain Activated Carbon from the People's Republic of China, 72 Fed. Reg. 20,988, 20,988 (Dep't Commerce Apr. 27, 2007).  The court previously remanded Commerce's selection of a surrogate value ("SV") for anthracite coal and Commerce's assignment of an all-others rate to Shanxi DMD Corporation ("Shanxi DMD").  Calgon Carbon Corp. v. United States, 145 F. Supp. 3d 1312, 1328 (CIT 2016) ("Calgon") (remanding Commerce's decision in Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013, 79 Fed. Reg. 70,163, 70,163 (Dep't Commerce Nov. 25, 2014) ("Final Results")).  For the reasons stated below, Commerce's Remand Results are sustained in part and remanded in part.

## BACKGROUND

The court presumes familiarity with the facts of the case as discussed in <u>Calgon</u>, 145 F.

Supp. 3d at 1316–19; however, for convenience, the court summarizes below the facts relevant

to the <u>Remand Results</u>.

To calculate the dumping margin in antidumping ("AD") duty cases involving a non-

market economy ("NME"), Commerce compares the goods' normal value,[1] derived from factors

of production ("FOPs") as valued in a surrogate market economy ("ME"), to the goods' export

price.[2]  19 U.S.C. § 1677b(c).  Commerce must use the "best available information" in selecting

surrogate data for which to value FOPs.  <u>Id.</u>  The surrogate data must "to the extent possible" be

from an ME country that is "at a level of economic development comparable to that of the

[NME] country" and is a "significant producer[] of comparable merchandise."  19 U.S.C.

§ 1677b(c)(4)(A)–(B).

For this review, Commerce selected Jacobi Carbons AB ("Jacobi") and Ningxia Guanhua

Cherishmet Activated Carbon Co., Ltd. ("Cherishmet") as the two mandatory respondents for the

period of review ("POR") of April 1, 2012, through March 31, 2013.  <u>See</u> <u>Certain Activated</u>

---

[1] Normal value is

> the price at which the foreign like product is first sold . . . for consumption in the
> exporting country, in the usual commercial quantities and in the ordinary course
> of trade and, to the extent practicable, at the same level of trade as the export price
> or constructed export price,

"at a time reasonably corresponding to the time of the sale used to determine the export price or
constructed export price."  19 U.S.C. § 1677b(a)(1)(A), (B)(i).

[2] Export price is "the price at which the subject merchandise is first sold . . . before the date of
importation by the producer or exporter of the subject merchandise outside of the United States
to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to
the United States[.]"  19 U.S.C. § 1677a(a).

Carbon from the People's Republic of China:  Preliminary Results of Antidumping

Administrative Review; 2012–2013, 79 Fed. Reg. 29,419, 29,419 (Dep't Commerce May 22,

2014) ("Preliminary Results"); Decision Memorandum for the Prelim. Results of Antidumping

Duty Administrative Review:  Certain Activated Carbon from the People's Republic of China at

3–4, PD 265 (May 16, 2014) ("Preliminary I&D Memo").

        In the Preliminary Results, Commerce selected the Philippines as the primary surrogate

country and selected an SV for anthracite coal, the main input in activated carbon, by using

Global Trade Atlas ("GTA") data contemporaneous with the present sixth POR ("POR6-

contemporaneous"), resulting in an SV of $1.19 per kilogram.  Calgon, 145 F. Supp. 3d at 1317;

Preliminary I&D Memo at 16.  Based on this SV, Commerce calculated Jacobi's and

Cherishmet's AD rates as $3.77 per kilogram and $2.05 per kilogram, respectively, resulting in a

separate rate of $3.13 per kilogram.  Calgon, 145 F. Supp. 3d at 1318.  Commerce continued to

select a PRC-wide rate of $2.42 per kilogram.  Id.

        For the Final Results, Commerce switched from using POR6-contemporaneous

Philippine GTA data to a value of $0.05 per kilogram, which was derived from Philippine GTA

data contemporaneous with the fifth POR ("POR5-contemporaneous").  Id. at 1317; see also

Certain Activated Carbon from the People's Republic of China:  Issues and Decision

Memorandum for the Final Results of the Sixth Antidumping Duty Administrative Review at

37–38, PD 310 (Nov. 18, 2014) ("I&D Memo").  Commerce made this change because of new

information suggesting that the type of anthracite coal underlying the POR6-contemporaneous

Philippine GTA data was not specific to the type used by the mandatory respondents, and no one

had challenged the POR5-contemporaneous Philippine GTA value in the previous review.

Calgon, 145 F. Supp. 3d at 1317–18.  Thus, the SV for anthracite coal fell from $1.19 per

kilogram to $0.05 per kilogram.  Id. at 1317.  For this reason, Jacobi's and Cherishmet's

dumping margins dropped from $3.77 per kilogram and $2.05 per kilogram, respectively, to

$0.04 per kilogram each.  Id. at 1318.  Similarly, the resulting separate rate decreased from $3.13

per kilogram to $0.04 per kilogram.  Id.  The PRC-wide rate remained at $2.42 per kilogram.  Id.

Although Shanxi DMD had filed a separate rate certification in the fifth administrative

review, it did not do so for the present sixth administrative review.  Id. at 1322.  After Commerce

determined in the Preliminary Results that the presumption of state control applied to Shanxi

DMD and thereby assigned Shanxi DMD the PRC-wide rate, which at the time was a more

favorable rate than the separate rate, no party contested Commerce's state control determination

prior to the Final Results.  Id. at 1318, 1322.  Thus, in the Final Results, Commerce, in addition

to calculating a new separate rate, continued to find that "[t]he PRC-wide entity include[d]

Shanxi DMD . . . ."  Id. at 1318 (quoting Final Results, 79 Fed. Reg. at 70,164 n.26).

The parties made several challenges to Commerce's Final Results.  Respondent Carbon

Activated Corporation ("CAC") challenged Commerce's Final Results in court on the basis that,

among other things, Commerce's presumption of state control applied to Shanxi DMD was not

supported by substantial evidence.  Id.  Plaintiffs Calgon Carbon Corp. ("Calgon") and Cabot

Norit Americas, Inc. ("Cabot") (collectively "Petitioners") also challenged Commerce's

selection of the POR5-contemporaneous Philippine GTA SV for anthracite coal.  Id. at 1323–28.

On the presumption of state control issue, the court agreed with CAC, holding that the

government's and Petitioners' decision not to address the merits of CAC's arguments by briefing

the issue as required by court rules, or by taking other opportunities to rectify the omission, left

the court with no other option than to sustain CAC's challenge.  Id. at 1322.  And, on the SV

issue, the court ruled that "Commerce improperly selected the SV derived from POR5-

contemporaneous Philippine GTA data (1) without placing any of the underlying data on the record to support the value and (2) without addressing contemporaneous surrogate data on the record from non-primary surrogate country sources." Id. at 1328. For these reasons, the court remanded the Final Results for Commerce to assign Shanxi DMD a separate rate and to "reconsider its selection of an SV for anthracite coal." Id.

Upon remand and under protest, Commerce complied with the court's instruction and assigned a separate rate to Shanxi DMD. Remand Results at 19. Also, Commerce reconsidered the SV for anthracite coal and, in doing so, found the POR6-contemporaneous GTA – Thai import data under HS 2701.11 "Anthracite Coal, Not Agglomerated" with a price of $0.33 per kilogram, to be the best available information for valuing the mandatory respondents' input. Id. at 4, 14, 49. In making this determination, Commerce chose not to put the underlying POR5-contemporaneous Philippine GTA data on the record, but rather chose to examine the POR6-contemporaneous GTA data from Thailand, South Africa, Ukraine, Colombia, and Indonesia, and further concluded that all but the Indonesian data were reliable. Id. at 15, 24. Moreover, Commerce determined that the four remaining countries had data of "equal reliability." Id. at 15. Commerce, therefore, decided "to select the anthracite coal SV based on which alternative surrogate country is the most significant producer of comparable merchandise." Id. at 15–16. Commerce reasoned, "the greater the significant production of activated carbon, the greater the intensity of the industry within a particular country, and thus the greater potential of broad-based demand for import of the inputs used in the production of the comparable merchandise." Id. at 16. As a result, Commerce calculated rates of $0.51 per kilogram for Jacobi and $0.52 per kilogram for Cherishmet, both of which represent an increase from the Final Results. Id. at 49. Commerce then calculated a separate rate of $0.51 per kilogram. Id. at 50–51.

Although no party, including CAC, contests Commerce's assigning of a separate rate to

Shanxi DMD, see Carbon Activated Corp. in Opp'n to the Dep't's Remand Results 1, ECF No.

105 ("CAC Cmts."), the parties do bring four major challenges.  First, Defendant-Intervenors

Cherishmet, CAC, Albemarle Corp. ("Albemarle"), Ningxia Huahi Activated Carbon Co., Ltd.

("Huahui"), and Jacobi (collectively, "Respondents") all argue that Commerce should have

selected the POR5-contemporaneous Philippine value as the SV for anthracite coal.  Cherishmet

Cmts. in Resp. to the Dep't of Commerce's Final Results of Redetermination 24–27, ECF No.

103 ("Cherishmet Cmts."); CAC Cmts. at 1–4; Def.-Intervenors Albemarle Corp. and Ningxia

Huahui Activated Carbon Co., Ltd. Cmts. on Final Results of Redetermination Pursuant to Court

Remand 2–9, ECF No. 106 ("Albemarle & Huahui Cmts.");[3] Jacobi's Cmt. on the Commerce

Dep't's Remand Results 2–4, ECF No. 110 ("Jacobi Cmts.").  Second, Cherishmet and Jacobi

challenge Commerce's rejection of other SV sources ultimately not relied upon by Commerce,

namely a U.S. value.  Cherishmet Cmts. at 27–30; Jacobi Cmts. at 17–26.  Third, Respondents

all challenge Commerce's determination that POR6-contemporaneous Thai GTA data are the

best available information for calculating an SV for anthracite coal.  Cherishmet Cmts. at 9–15;

CAC Cmts. at 9–13; Albemarle & Huahui Cmts. at 9–10; Jacobi Cmts. at 5–15.  Fourth,

Respondents also contend that Commerce's use of a "tie-breaking" methodology, in which

Commerce selected the surrogate country that is the most significant producer of activate carbon

to eventually select the Thai SV over other otherwise equal SVs, was unlawful.  Cherishmet

Cmts. at 15–21; CAC Cmts. at 4–9; Albemarle Cmts. at 10–11; Jacobi Cmts. at 15–17.

---

[3] Albemarle and Huahui "adopt and incorporate by reference any comments filed by the other . . . respondents on the" Remand Results.  Albemarle & Huahui Cmts. at 12.  Thus, although the court indicates which party or parties have explicitly advanced each argument below, it notes here that Albemarle and Huahui also assert arguments made by the other defendant-intervenors.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds

Commerce's determination in an administrative review unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

## I.      Assignment of a Separate Rate to Shanxi DMD

In the prior decision, the court remanded the <u>Final Results</u> with instructions for

Commerce to assign Shanxi DMD a separate rate.  <u>Calgon</u>, 145 F. Supp. 3d at 1328.  Under

protest, Commerce did so, assigning Shanxi DMD the separate rate, which Commerce calculated

as $0.51 per kilogram.  <u>Remand Results</u> at 20.  "Specifically, [Commerce] assigned Shanxi

DMD a rate calculated using the ranged total U.S. sales quantities from the public versions of the

submissions from the individually-examined respondents with weighted-average dumping

margins that are not zero or de minimis . . . ." <u>Id.</u> at 20.  Commerce asserts that this method was

consistent with its typical practice.  <u>Id.</u> at 50–51; <u>see</u> <u>Yangzhou Bestpak Gifts & Crafts Co. v.</u>

<u>United States</u>, 716 F.3d 1370, 1374 (Fed. Cir. 2013) (noting that in the NME context, "[t]he

separate rate for eligible non-mandatory respondents is generally calculated following the

statutory method for determining the 'all others rate' under [19 U.S.C.] § 1673d(c)(5)(A)").

Petitioners continue to disagree with the court's previous decision regarding the application of a

separate rate to Shanxi DMD, but both Petitioners and the government recognize that Commerce

properly complied with the court's remand order on this issue.  Def.'s Resp. to Def.-Intrvnrs.'

Cmts. on Remand Redetermination 4–5, ECF No. 124 ("Gov't Resp."); Pls.' Cmts. in Supp. of

the Dep't of Commerce's Remand Redetermination 5 n.4, ECF No. 125 ("Pet'rs Resp.").

Because no party objected to this determination and because Commerce's decision is in accordance with the law, Commerce's assignment of a separate rate to Shanxi DMD is sustained. The court, however, clarifies that because it is remanding the issue of Commerce's selection of the SV for anthracite coal, as discussed below, any resulting changes to the value of the separate rate should be reflected in the rate ultimately assigned to Shanxi DMD.

## II.   Commerce's Selection of a Surrogate Value for Anthracite Coal

In selecting surrogate data, Commerce must use the "best available information."  19 U.S.C. § 1677b(c)(1)(B).  Because there is no statutory definition of "best available information," Commerce enjoys broad discretion over what factors satisfy this criterion.  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).  Commerce's discretion, however, is limited by the statute's objective of "obtain[ing] the most accurate dumping margins possible," meaning Commerce's choice of the best available information "must evidence a rational and reasonable relationship to the factor of production it represents" to be supported by substantial evidence.  Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1191 (2004).  Commerce "must defend its surrogate choices when confronted with data undermining the surrogate's reliability."  Blue Field (Sichuan) Food Indus. Co. v. United States, 949 F. Supp. 2d 1311, 1326 (CIT 2013); see also Mittal Steel Galatai S.A. v. United States, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (CIT 2007).

Commerce itself has established a practice, in assessing data sources, to select data with (1) "period-wide price averages," (2) "prices specific to the input in question," (3) "prices that are net of taxes and import duties," (4) "prices that are contemporaneous with the period of investigation or review," and (5) "publicly available data."  Policy Bulletin 04.1, Non–Market

Economy Surrogate Country Selection Process (Mar. 1, 2004), <u>available at</u>

http://enforcement.trade.gov/policy/bull04-1.html (last visited Nov. 14, 2016) ("Policy Bulletin

04.1"); <u>see</u> <u>Qingdao Sea-Line Trading Co. v. United States</u>, 766 F.3d 1378, 1386 (Fed. Cir.

2014); <u>Remand Results</u> at 5.  Commerce's stated "preference is to satisfy the breadth of the

aforementioned selection criteria."  <u>Remand Results</u> at 5.  A reviewing court evaluates "whether

a reasonable mind could conclude that Commerce chose the best available information."

<u>Zhejiang Dunan Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1340 (Fed. Cir. 2011)

(quoting <u>Goldlink Indus. Co. v. United States</u>, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327

(2006)).

    <u>A.</u>    <u>Potential Surrogate Value Sources</u>

    This appeal challenges Commerce's rejection of the POR5-contemporaneous Philippine

GTA value and the U.S. Energy Information Agency ("EIA") value and also challenges

Commerce's determination that the POR6-contemporaneous Thai GTA value is reliable.  The

court addresses each SV source in turn.[4]

    *1.*    *Philippine Value*

    On remand, Commerce considered the POR6-contemporaneous GTA data from other

economically comparable countries before considering the POR5-contemporaneous Philippine

---

[4] With respect to the other countries considered, Commerce found that POR6-contemporaneous
Ukranian and South African GTA data met the SV criteria where no party challenged this data's
reliability.  <u>Remand Results</u> at 12–15.  Commerce did so after determining that Ukraine is at a
level of comparable economic development to the PRC because, even though it was not included
in the initial list of potential surrogate countries, its Gross National Income ("GNI") falls within
the range of the other economically comparable countries.  <u>Id.</u> at 12–14.  Commerce also
concluded that the POR6-contemporaneous Indonesian GTA value was unreliable and, therefore,
inappropriate to use as an SV for anthracite coal.  <u>Id.</u> at 9.  No party challenges these
determinations.

GTA value, recognizing that the latter data's lack of contemporaneity made it inherently unequal as compared to the former data.  Remand Results at 4, 5, 24–25.  Commerce refused to reopen the record so that interested parties could place the underlying data supporting the POR5-contemporaneous Philippine GTA value on the record, or placing it on the record itself, and instead considered the POR6-contemporaneous GTA data.  Id. at 24–25.  The court sees no issue in Commerce's reasoning.

Respondents all argue[5] that Commerce failed to comply with the court's remand order and erred by not reopening the record to then consider the underlying data from which the Philippine value was calculated.  Cherishmet Cmts. at 24–27; CAC Cmts. at 1–2; Albemarle & Huahui Cmts. at 5–6, 8; Jacobi Cmts. at 2–4.  Albemarle, Huahui, and Jacobi argue that Commerce failed to compare the POR5-contemporaneous GTA Philippine value to the POR6-contemporaneous GTA Thai value, which it ultimately selected.  Albemarle & Huahui Cmts. at 6–7; see Jacobi Cmts. at 2–4.[6]

Commerce complied with the court's remand order and lawfully chose not to rely on the POR5-contemporaneous GTA Philippine value.  The remand order indicated that "Commerce was required to explain based on the record evidence why it rejected such data," referencing the

---

[5] Cherishmet, CAC, Albemarle, and Huahui also attempt to re-litigate many of the issues decided prior to remand relating to the anthracite coal SV.  See, e.g., Cherishmet Cmts. at 26–27; CAC Cmts. at 3–4; Albemarle & Huahui Cmts. at 2–4.  The court declines to revisit its previous opinion as no party provides a sufficient reason for the court to do so.  See Calgon, 145 F. Supp. 3d at 1323, 1326–28.  The court, therefore, will only address new issues raised with respect to the POR5-contemporaneous GTA Philippine value.

[6] Cherishmet and CAC attempt to argue that other data on the record, namely the U.S. EIA data, confirms the reliability of the Philippine value.  Cherishmet Cmts. at 25–26; CAC Cmts. at 2–3, 4.  Commerce's reasonable rejection of the U.S. EIA data as a benchmark, however, is discussed below.

other POR6-contemporaneous data, "<u>before</u> selecting the POR5-contemporaneous Philippine

GTA data." <u>Calgon</u>, 145 F. Supp. 3d at 1328 (emphasis added).  Commerce determined that

certain POR6-contemporaneous data were reliable and, therefore, rejected the POR5-

contemporanoeus GTA Philippine value because it was not POR-contemporaneous and thus not

"fairly equal" to the other contemporaneous data.  <u>Remand Results</u> at 24.  Commerce recognized

that even applying an inflator would not itself remedy all issues pertaining to lack of

contemporaneity and, therefore, found it unnecessary to reopen the record.  <u>Id.</u> at 24–25 (citing

<u>Calgon</u>, 145 F. Supp. 3d at 1327).  The statute acknowledges the importance of contemporaneity

in its requirement for Commerce to evaluate AD margins each year.  <u>See</u> 19 U.S.C. § 1675(a)(1)

(providing for periodic reviews); <u>see</u> <u>Albemarle Corp. & Subsidiaries v. United States</u>, 821 F.3d

1345, 1356 (Fed. Cir. 2016) (acknowledging "the statute's manifest preference for

contemporaneity in periodic administrative reviews").  Commerce, therefore, properly, within

the discretion afforded to it by the statute, compared the Philippine value to other values on the

record, which were deemed reliable, and adequately explained why it was not equal.  <u>See</u>

<u>Calgon</u>, 145 F. Supp. 3d at 1327, 1328 n.16 (discussing the effect of time-based distortions on

calculating AD margins); <u>see also</u> <u>QVD Food</u>, 658 F.3d at 1323 (discussing Commerce's

discretion).  That is all that is required.

Commerce did not abuse its discretion by not reopening the record.  Because the court in

its remand order explicitly noted that the underlying data are necessary for the court to fully

review Commerce's choice, <u>see</u> <u>Calgon</u>, 145 F. Supp. 3d at 1327, it would likely be a better

practice for Commerce to have reopened the record to allow a party to place that data on the

record or for Commerce to have done so sua sponte.[7]  But, contrary to the Respondents'

arguments, the court's remand order did not require Commerce to do so.  Instead, the remand

order explained at length that Commerce was required to evaluate the propriety of record

evidence containing POR6-contemporaneous data before it could consider other, non-fairly equal

data.  Commerce did so and, thereby, properly rejected the POR5-contemporaneous GTA

Philippine value.

    *2.*    *U.S. Value*

    On remand, Commerce did not consider data from the U.S. EIA "as a potential SV for

anthracite coal" because the United States "is not at the same level of economic development as

the PRC," noting that during the POR the Gross National Income ("GNI") for the United States

was nearly ten times higher than the PRC's.  Remand Results at 16 n.74, 26; see also Gov't

Resp. at 13 n.3.  Commerce's lawfully rejected this value.

    Cherishmet and Jacobi, who concede that the United States is not economically

comparable to the PRC, argue that Commerce was still required to consider the U.S. EIA data as

an SV source.  Cherishmet Cmts. at 28–29; Jacobi Cmts. at 17, 22–23, 24–25.  They argue that

the U.S. EIA data are product-specific, are contemporaneous with the POR, and actually serve to

corroborate the POR5-contemporaneous Philippines GTA value.  Cherishmet Cmts. at 29–30;

Jacobi Cmts. at 17–22, 24.  Alternatively, Cherishmet argues Commerce should have considered

---

[7] Although Respondents would prefer Commerce to have employed either of these methods so that the underlying data could be placed on the record, adding the data guarantees only that more resources would be utilized in analyzing the data but does not guarantee that the data itself would be usable.  Without the data on the record, neither the court nor Commerce can determine whether the POR5-contemporaneous GTA Philippine data suffer from similar lack of comparability issues as the POR6-contemporaneous GTA Philippine data.  Nevertheless, the court need not entertain such possibilities in this case where there are other usable SVs on the record.

that data as a benchmark to gauge the accuracy of the other SVs on the record.  Cherishmet

Cmts. at 27, 29.

Commerce's decision not to rely on the U.S. EIA data is supported by substantial

evidence.  Commerce abided by the statutory directive to rely on surrogate data from an

economically comparable country before considering data from non-economically comparable

countries.  By statute, "the valuation of the [FOPs] shall be based on the best available

information regarding the values of such factors in [an ME] country or countries considered to be

appropriate by [Commerce]."  19 U.S.C. § 1677b(c)(1)(B).  In doing so, Commerce shall utilize

"to the extent possible, the prices or costs of [FOPs] in one or more [ME] countries that are . . . at

a level of economic development comparable to that of the [NME]."  19 U.S.C. § 1677b(c)(4).

Commerce turns to "other countries, including the United States" when it "finds that the

available information accumulated pursuant to the previous described method is inadequate for

purposes of determining the normal value."  19 U.S.C. § 1677b(c)(2).  Commerce made no such

finding that the SVs from economically comparable countries were inadequate; instead,

Commerce determined that it had usable SVs from Thailand, Ukraine, South Africa, and

Colombia.[8]  Remand Results at 6–15.  Commerce explained that during the POR the GNI for the

United States was nearly ten times higher than the PRC's GNI and, in any event, "the record

---

[8] Jacobi also argues that the Remand Results run counter to Commerce's Surrogate Country
Memorandum, which explicitly contemplates the use of SVs from the United States.  Jacobi
Cmts. at 24–26.  Jacobi's argument fails.  A plain reading of that memorandum clearly
demonstrates that it closely follows the statutory directive discussed above and Commerce only
contemplated using a non-economically comparable country's surrogate data where data from an
economically comparable country were unavailable.  See Deadlines for Surrogate Country and
Surrogate Value Cmts. at 3, PD 73 (Aug. 2, 2013).

contains adequate data from countries which are at the same level of economic development as

the PRC . . . ."  Remand Results at 26, 29; see also Gov't Resp. at 13 n.3.[9]

Jacobi's and Cherishmet's reliance on Clearon Corp v. United States, Slip Op. 15-91,

2015 WL 4978995, at *4 (CIT Aug. 20, 2015), is misplaced.  There, the court analyzed whether

Commerce properly evaluated data considerations in selecting a primary surrogate country,

rather than the selection of a particular SV.  Id.  Commerce selected the Philippines, a country

found to be economically comparable to the NME, but failed to adequately explain whether

India, which was non-economically comparable, provided a better source of data.  Id. at *4–5.

The court explained that Commerce "burden[s] the party proposing a non-listed country with

demonstrating that no country on the surrogate country list provides the scope of 'quality' data

that it requires in order to make a primary surrogate country selection" but "if that threshold is

met, then Commerce must consider the quality of the data on [sic] the country not on the list that

a party proposes."  Id.  Assuming arguendo that Commerce's selection of the particular SV for

anthracite coal is guided by the same standards for Commerce's selection of a primary surrogate

country and that Clearon is instructive, Jacobi and Cherishmet have not demonstrated that

Commerce acted unreasonably.  Neither party contests Commerce's determination that South

Africa and Ukraine are economically comparable to the PRC and that both provide usable SVs.

---

[9] Jacobi's additional argument that Commerce failed to comply with the court's remand order misunderstands the court's prior opinion.  See Jacobi Cmts. at 22–23.  In its prior opinion and after specifically documenting that Commerce had surrogate data on the record from Indonesia, Thailand, South Africa, and Ukraine, the court held that Commerce failed to "address[] contemporaneous surrogate data on the record from non-primary surrogate country sources." Calgon, 145 F. Supp. 3d at 1328.  The remand order did not explicitly state that Commerce must address the U.S. EIA data, but, even if the remand order could be construed as requiring Commerce to address that data, Commerce did so.  As discussed, Commerce lawfully disregarded the data on the basis of lack of economic comparability.  See Remand Results at 16, 25–26, 29.

And, as explained below, Commerce's determination that Thailand is economically comparable and provides a usable SV is also supported by substantial evidence. Therefore, because the record contained several other sources of reliable data from surrogate countries on Commerce's list, Jacobi and Cherishmet have not met their burden to demonstrate that Commerce should have evaluated an off-list source, such as the U.S. EIA data.

Similarly, Cherishmet's reliance on <u>Blue Field</u> also fails. In that case, the court recognized that Commerce improperly "ignored useful data" from a country not on Commerce's list of economically comparable surrogate countries where Commerce relied on its so-called preference for prioritizing data from its primary surrogate country, even though the data from the primary surrogate country had "apparently aberrational qualities." <u>Blue Field</u>, 949 F. Supp. 2d at 1330; <u>see</u> <u>id.</u> at 1326–27 (explaining that the aberrational qualities in that case existed in part because the "range of rice straw prices [was] $10.00 to $90.08 per metric ton" but Commerce relied on a SV of $1350.88 from the primary surrogate country, about fifteen times higher than the upper limit of the range). Not only did Commerce correctly find here that the Thai data are not aberrational, as discussed, but it also did not ignore the U.S. data—instead, Commerce specifically explained why the <u>magnitude</u> of the United States' lack of economic comparability rendered the U.S. EIA value inappropriate to use as an SV. <u>See</u> <u>Remand Results</u> at 16, 25–26, 28.

Commerce also acted reasonably in not utilizing the U.S. EIA data as a benchmark. In the case cited by Cherishmet, the court recognized that "Commerce can use data [from other economically comparable countries on Commerce's surrogate country list] as benchmarks . . . ." <u>See</u> <u>Blue Field</u>, 949 F. Supp. 2d at 1332 (acknowledging that Philippines was on the surrogate list). That proposition does not support Cherishmet's position. Indeed, the court in <u>Blue Field</u>

acknowledged that "[b]enchmarks, of course, become less informative the greater the difference in the levels of development of the countries from which the data derive." Id. at 1317.  Such is the situation here; and, it is unlikely that a benchmark from the United States, a country that had a GNI nearly ten times higher than the PRC, would be probative.  It is not the case that Commerce simply disregarded potential benchmarking data; instead, Commerce used POR-contemporaneous values from other economically comparable countries to establish a range and determined that its selected SV fell within the range.  See Remand Results at 41.  Thus, Commerce properly refused to consider the U.S. EIA data as a benchmark.

   3. *Thai Value*

  Commerce found that the POR6-contemporaneous Thai GTA data met Commerce's SV selection criteria and were otherwise reliable.  Remand Results at 10–12, 40–47.[10]  The court sustains this aspect of Commerce's determination.

  Respondents raise four challenges to Commerce's reliance on the Thai SV for anthracite coal.  First, Jacobi argues that a 2013 U.S. Trade Representative ("USTR") report, which made "factual finding[s]" regarding corruption and transparency concerns with Thai customs, undermines the reliability of the Thai SV.  Jacobi Cmts. at 13–15.  Second, Albemarle, Huahui, and Jacobi contend that the POR6-contemporaneous Thai GTA data, which relate to a "basket category," is not specific to the type of anthracite coal consumed by the mandatory respondents.  Albemarle & Huahui Cmts. at 9–10; Jacobi Cmts. at 5–9.  Third, Respondents all argue that the Thai SV is unreliable due to discrepancies in export data and in data used to calculate the

---

[10] Commerce also correctly disregarded issues with a potentially aberrant Malaysian export AUV, which were "higher than the other import values being considered," on the basis that the Malaysian export AUV "ha[d] no effect on the overall Thai AUV" of $0.33 per kilogram due to its very low quantity.  Remand Results at 11.

average unit values ("AUVs").  Cherishmet Cmts. at 9–12, 13–14; CAC Cmts. at 12–13;

Albemarle & Huahui Cmts. at 10; Jacobi Cmts. at 10–13.  Fourth, Cherishmet and CAC argue

that Commerce's preliminary results of the eighth administrative review demonstrate that the

Thai SV is unreliably volatile and that Commerce's determination here is arbitrary.  Cherishmet

Cmts. at 14; CAC Cmts. at 9–11.

        Commerce's determination that the POR6-contemporaneous Thai GTA data are reliable

is supported by substantial evidence.  As a preliminary matter, Commerce acted reasonably here,

where it refused to rely on the 2013 USTR report.  Commerce determined that the report, which

was not placed on the record of the review, nevertheless, did not question the reliability of the

Thai SV.  Remand Results at 44–45.  Instead, the report merely comments on some Thai

Customs' practices but does not show "that the specific SV data relied on by [Commerce in the

Remand Results] is the result of the alleged Thai Customs practices and thus unreliable."  Id. at

45.  Although the report does provide evidence of manipulation by Thai Customs,[11] it does not

clarify how significant these concerns are nor does it tie these concerns specifically to the import

data being relied upon by Commerce.  Thus, without more, the general concerns noted in the

report do not sufficiently call into question the veracity of the specific Thai GTA data relied

upon by Commerce or render the Thai data unreliable.

        Moreover, record evidence does not impugn Commerce's conclusion that the Thai SV is

sufficiently specific to the type of anthracite coal used by the mandatory respondents.  The mere

---

[11] The report in relevant part discusses "the lack of transparency in the Thai customs regime," "discretionary authority exercised by Customs Department officials" including "the authority and discretion to increase the customs value of imports," and similar concerns.  United States Trade Representative, 2013 National Trade Estimate Report on Foreign Trade Barriers 355 (2013), available at https://ustr.gov/sites/default/files/2013%20NTE.pdf (last visited Nov. 14, 2016).

fact that the Thai data are derived from a basket category, i.e., HTS code 2701.11 "Anthracite

Coal, Not Agglomerated," on its own does not demonstrate that the Thai data are not specific.

Indeed, as Commerce recognized, the flaw in Albemarle, Huahui, and Jacobi's argument is

further underscored by the fact that all four of the POR6-contemporaneous GTA data sources

considered by Commerce each derive from the same basket category.[12]  See Remand Results at

46–47; see also Cherishmet's Surrogate Value at Ex. 3D–3E, PD 152–60 (Nov. 20, 2013)

("Cherishmet's SV Cmts.") (South Africa and Ukraine); Pet'rs' Final Submission of Surrogate

Value Data at Attach., PD 258 (Apr. 21, 2014) ("Pet'rs' Final SV Data") (Thailand and

Colombia).  Respondents, therefore, have failed to show that Commerce's determination

regarding the specificity of the Thai data is unsupported by substantial evidence.

 And, Respondents' arguments regarding discrepancies in export data fail.  Commerce's

Remand Results rejected arguments regarding discrepancies in export AUVs from Australia,

Malaysia, and Ukraine, stating instead that Commerce "does not expect export and import data to

match on a one-to-one ratio" due to "temporal differences, product mix differences, differences

in level of sales . . . and differences in types of entry . . . ."  See Remand Results at 7, 10, 43–44.

Although Commerce's explanation leaves something to be desired, it is sufficient on this record

and Commerce acted reasonably.  The Thai value selected by Commerce is derived from import

---

[12] The Respondents' preferred SV, the previously rejected POR5-contemporaneous Philippine GTA value, also arise from the same basket category.  Instead, Jacobi argues that the POR5-contemporaneous Philippine GTA value is "undisputed[ly] specific" because no party has challenged that value on the basis of specificity.  See Jacobi Cmts. at 9.  Not only is this conclusion unreviewable where Commerce has failed to put the underlying data on the record, but also the failure to challenge the specificity of a source does not automatically make it more specific than a source derived from the same basket category.  Jacobi would also prefer that Commerce have relied on the U.S. EIA data, which Jacobi argues is "demonstrated to be specific."  Id.  But, as discussed, Commerce properly refused to rely on the U.S. data due to economic comparability issues.

GTA data from Australia, Malaysia, and Ukraine, totaling 681,930 kilograms of imports.[13]

Pet'rs' Final SV Data at Attach.  Respondents are correct that the record contained export GTA

data from each of these three countries covering the same time period and the same basket

category of HTS 2701.11, and that data demonstrated that the quantity of exports of anthracite

coal from these countries may be lower than the quantity of imports into Thailand as reflected in

the GTA data.  Cherishmet's Second SV Rebuttal Submission at Exs. 1–3, PD 263 (May 1,

2014) ("Cherishmet's Second SV Cmts.").  Although the export data showed no quantities of

exports from Australia or Malaysia to Thailand during the POR, id. at Exs. 1–2, the export data

did corroborate that 483,000 kilograms (more than 70% of the quantity reported in the import

data) of anthracite coal were exported from Ukraine to Thailand, id. at Ex. 3.  Although the

export value of $0.09 per kilogram calculated for Ukranian export data differed from the import

value of $0.30 per kilogram calculated for Thai import data of anthracite coal from Ukraine, that

fact alone appears insufficient to render Commerce's decision unsupported by substantial

evidence where there is no information on the record to explain why this discrepancy between

the GTA import data and export data exists.  See Remand Results at 44 ("[P]arties offer no

reasons for the differences except that the values do not match."); see also Nation Ford, 166 F.3d

at 1377 (recognizing that Commerce has "wide discretion in the valuation of [FOPs]").[14]

---

[13] Specifically, the Thai GTA import data for anthracite coal indicates that 70,980 kilograms
were imported from Australia into Thailand; 50 kilograms from Malaysia; and 610,900
kilograms from Ukraine.  Pet'rs' Final SV Data at Attach.

[14] Commerce's understanding that export data and import data, even that from the same reporting
service such as GTA, do not match on a one-to-one basis has further support in the record.  For
instance, the South African value, which Commerce described in its Remand Results as "GTA
import data," does not show a one-to-one comparison in imports of anthracite coal from Ukraine
(81,172,695 kilograms) as compared to the export GTA data from Ukraine (22,001,620

(continued . . .)

Commerce further verified the import AUV by engaging in a comparative analysis of the

Thai import data.  Commerce determined that "the Thai GTA AUV falls between Colombia's

AUV, which represents the upper tier of AUVs, and South Africa's and Ukraine's which falls

below Thailand's AUV."  Remand Results at 41.  More precisely, the Thai value of $0.33 per

kilogram fell above the Ukrainian value of $0.16 per kilogram and the South African value of

$0.19 per kilogram, but fell below the Colombian value of $0.50 per kilogram.  See Pet'rs' Final

SV Data at Attach.; Cherishmet's SV Cmts. at Exs. 3D–3E.  Cherishmet's arguments that the

Thai value is "significantly higher" than the South African and Ukranian values fail, see

Cherishmet Cmts. at 12, because the Thai value is not so significantly higher such that it is

aberrant.  Although the Thai value is higher than the South African and Ukranian values, it is just

barely two times as much as the Ukranian value and not even two times as much as the South

African value.  Commerce further found that the Thai value was derived from a commercial

quantity of imports of 681,930 kilograms.  Remand Results at 43; Pet'rs' Final SV Data at

Attach.  Admittedly, this quantity is meaningfully lower relative to the import volume, on which

other values on the record are based,[15] thereby indicating that the Thai value is less reliable than

these other values.  Still, as explained, the Thai value viewed in isolation is sufficiently reliable

---

kilograms).  Compare Cherishmet's SV Cmts. at Ex. 3E, with Cherishmet's Second SV Cmts. at
Ex. 3; see also Remand Results at 12.  A similar discrepancy exists in GTA import data for
Indonesia as compared to GTA export data from Singapore, Malaysia, and Belgium.  Remand
Results at 8 (discussing Singapore).  Compare Pet'rs' Surrogate Values for the Prelim. Results at
Ex. 2A, PD 161–65 (Nov. 20, 2013) ("Pet'rs' SV Cmts.") (providing Indonesian import data),
with Cherishmet's Second SV Cmts. at Exs. 2, 4 (providing Malaysia and Belgium export data).

[15] For instance, Commerce acknowledges that the Thai value is derived from a smaller quantity
than the South African and Ukranian values.  Remand Results at 43; see also Cherishmet's SV
Cmts. at Exs. 3D–3E (listing import quantity of 14,747,893 kilograms for Ukraine and
81,501,689 kilograms for South Africa).  Regardless, Commerce's reliance on a commercial
quantity is reasonable here for the purposes of demonstrating that the Thai value is not aberrant.

to serve as an SV.  Furthermore, the Thai value is within the range, which has an upper limit set

by the Colombian value.[16]  The Thai value is simply not aberrant.[17]

Commerce also looked at historical Thai GTA data and found that the Thai value

"demonstrates no volatile behavior during the POR," but instead maintained a "gradual increase"

from 2009 to 2011, which was "in line with Indonesia's and the Philippine's AUV" and which

Commerce explained were the only two other economically comparable countries for which

historical record data existed.  Id. at 42.  Commerce noted that "the anthracite coal SV for

Thailand was 0.46, 0.62, and 0.73 kg/USD[18] for . . . 2009, 2010, and 2011, respectively."  Id. at

42 n.170.  Notably, the Thai SV for the POR of $0.33 is less than the Thai SV for anthracite coal

from 2009 to 2011.[19]  See Calgon Carbon Corp. v. United States, Slip Op. 11-21, 2011 WL

---

[16] The Colombian value properly sets the upper limit of the range and Cherishmet's arguments to the contrary fail.  See Cherishmet's Cmts. at 21–24.  Commerce determined that the POR6-contemproaneous Colombian GTA data met the SV selection criteria and were not aberrational.  Remand Results at 6–7, 47–49.  Cherishmet's arguments that United Nations ("UN") Comtrade export data for Belgium, which covered different time periods (2009–2012) and only partially overlap with the POR, shows a lower export AUV are unconvincing and not probative of the prices during the POR.  Cherishmet also fails to submit evidence on the record regarding the significance of this evidence by demonstrating what percentage of imports of anthracite coal into Colombia derived from Belgium for 2009, 2010, 2011, and 2012.  Thus, Commerce's decision to rely on the Colombian SV is reasonable here.

[17] Cherishmet also contends that U.S. EIA data render the Thai value aberrant.  Cherishmet Cmts. at 13.  But, as explained, Commerce properly refused to rely on the U.S. EIA data for benchmarking purposes.

[18] Commerce apparently inadvertently wrote "kg/USD," but it is clear from the context and the record material cited in the Remand Results that Commerce meant "USD per kilograms."

[19] Respondents' attempt to point to UN Comtrade data—data from a different source—to impeach the AUVs calculated in the GTA data is unsuccessful.  See, e.g., Cherishmet Cmts. at 13.  Commerce's explanation of why export data and import data do not match one-to-one appears even more convincing where the difference appears in two different data sources.  See Remand Results at 43–44.

637605, at *9–10 (CIT Feb. 17, 2011) (upholding Commerce's SV where it was corroborated by

other import data on the record).  This analysis, therefore, helped confirm the reliability of the

Thai import data.  Indeed, this analysis by Commerce addressed the concerns raised by

Cherishmet and CAC regarding the preliminary results of the eighth administrative review where

Commerce undertook a similar comparative analysis and found the Thai import SV was

unreliably volatile.[20]  Here, Commerce reasonably explained away those preliminary results of

the eighth administrative review by recognizing that the volatility analysis there involved

different comparison countries because the surrogate countries between the two segments are

different.  Remand Results at 41.  And, Commerce undertook a volatility analysis with the

evidence on the record of the present review, resulting in a finding of "no volatile behavior."  Id.

at 42.  Thus, Commerce's finding that the Thai SV is reliable is reasonable and supported by

substantial evidence.

---

[20] CAC also makes passing reference to an argument that Commerce improperly rejected a chart
submitted by CAC regarding the preliminary results of the eighth administrative review from the
record.  See CAC Cmts. at 10.  To the extent that CAC contends that Commerce's rejection of
the chart was unlawful, CAC has not clearly raised any such argument before the court, at most
making "bare assertions" without any meaningful argumentation or "citation to any applicable
statutory or regulatory provisions," and thus any such argument is waived.  MTZ Polyfilms, Ltd.
v. United States, 33 CIT 1575, 1578, 659 F. Supp. 2d 1303, 1308 (2009) (quoting Fujian Lianfu
Forestry Co. v. United States, 33 CIT 1056, 1078, 638 F. Supp. 2d 1325, 1349 (2009)).
Regardless, it is unlikely CAC would have succeeded on such an argument given Commerce's
regulation regarding the rejection of untimely filed factual information.  19 C.F.R.
§ 351.302(d)(1)(i); see also Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343,
1351–52 (Fed. Cir. 2015) (acknowledging Commerce's discretion regarding the ability to set and
enforce its deadlines).  Indeed, Commerce appears to have acted reasonably here in rejecting new
factual information, where the deadline to submit SV information had lapsed and Commerce
never reopened the record on remand.  In any event, Commerce squarely addressed the substance
of the volatility issue.

B.      Significant Producer Methodology

After determining that it was "confronted with data sources of equal reliability from multiple possible surrogate countries," Commerce "select[ed] the anthracite coal SV based on which alternative surrogate country is the most significant producer of comparable merchandise." Remand Results at 15–16.  As a result, Commerce selected the Thai value because, of the countries from which Commerce had reliable SV information, Thailand was the most significant producer.  See id. at 16.

Cherishmet, CAC, Albemarle, and Huahui argue that Commerce erred by relying on significant production rather than quantity of imports in selecting amongst potential SV sources, contrary to its practice.  Cherishmet Cmts. at 15–18, 19–21; CAC Cmts. at 4–8; Albemarle & Huahui Cmts. at 10–11.  CAC argues that "there is no rational link between Thai production of activated carbon and these import statistics" especially because Thailand's imports are "small" and do not represent a "commercial quantity."  CAC Cmts. at 8–9.

Commerce appears to regularly use import volume as a tie-breaking methodology when faced with equally comparable SV sources.  The parties have identified three situations in which Commerce has followed this practice.  See Peer Bearing Co.-Changshan v. United States, Slip Op. 13-116, 2013 WL 4615134, at *4 (CIT Aug. 30, 2013), vacated and remanded on other grounds, 766 F.3d 1396 (Fed. Cir. 2014); Decision Memorandum for the Final Results of Antidumping Duty Administrative Review:  Chlorinated Isocyanurates from the People's Republic of China; 2013-2014 at 6–7, A-570-898 (Jan. 4, 2016), available at http://enforcement.trade.gov/frn/summary/prc/2016-00366-1.pdf (last visited Nov. 14, 2016); Decision Memorandum for the Final Results of Antidumping Duty Administrative Review:  Chlorinated Isocyanurates from the People's Republic of China; 2012-2013 at 9, A-570-898

(Jan. 21, 2015), available at http://enforcement.trade.gov/frn/summary/prc/2015-01604-1.pdf

(last visited Nov. 14, 2016) ("Chlorinated Isocyanurates 2012–2013").  Although in the two

chlorinated isocyanurates cases mentioned Commerce did not provide a reason for using import

volume, in Peer Bearing, Commerce explained that it preferred data from Indonesia over data

from the Philippines because Indonesia's data "were based on larger quantities and values and

therefore 'more robust and representative of broader market averages.'"  2013 WL 4615134 at

*4; see also Final Results of Redetermination Pursuant to Court Remand at 12, Peer Bearing Co.-

Changshan v. United States, No. 09-00052 (CIT Oct. 2, 2012), ECF No. 124-1.  Commerce has

used this methodology in the eighth administrative review of the present AD order, where it

valued anthracite coal based on imports from Romania because they were "so much larger than

those into Mexico and South Africa that it demonstrates a broader market average for this input."

Certain Activated Carbon from the People's Republic of China:  Issues and Decision

Memorandum for the Final Results of the Eighth Antidumping Duty Administrative Review at

28, A-570-904 (Aug. 31, 2016), available at http://enforcement.trade.gov/frn/summary/prc/2016-

21660-1.pdf (last visited Nov. 14, 2016).  The government is able to point to only one situation

in which Commerce relied on its significant producer rationale proposed here, but in that case

Commerce did not provide a reason why it ranked the SV sources based on significant

production.  See Final Results of Redetermination Pursuant to Court Remand at 13, Ad Hoc

Shrimp Trade Action Comm. v. United States, No. 13-00346 (CIT Sept. 14, 2015), ECF No. 65

(selecting Indonesia over India and the Philippines).  Thus, Commerce's own decisions have

explained that it uses[21] import volumes, which speak to the issue of broader market averages

and, therefore, representativeness.

Commerce appears to have employed an approach that, in the absence of reasoning, gives

the appearance of being results-oriented.  It has failed to explain, on this record, why significant

production's ability to encompass broad-based demand outweighs the representativeness

associated with broader market averages.  Substantial evidence review "requires Commerce to

examine the record and articulate a satisfactory explanation for its action."  Bestpak, 716 F.3d at

1378.  Commerce explained that it "does not generally consider import quantity in its SV

selection criteria, except in isolated cases," but specifically listed as one example of such an

isolated case "select[ion] among competing SVs from secondary surrogate countries," the exact

situation here.  Remand Results at 42–43.  Although it acknowledged that in some cases it has

previously used volume of imports to select from alternative surrogate countries, Commerce

rejected that approach here "because of the relative size of the significant production quantities

of the potential anthracite coal SV sources."  Remand Results at 32–33 ("Because South

Africa's, Colombia's, and Ukraine's production quantities of activated carbon are considerably

less than the Philippines, [Commerce] finds it reasonable to seek a secondary surrogate country

---

[21] The court hesitates to state that Commerce has a clear "practice" in doing so, recognizing
instead that Commerce has discretion in selecting among SVs.  Although the Respondents argue
that  Chlorinated Isocyanurates 2012–2013 established a practice to rank fairly equal SV sources
by import volume, Commerce there simply stated that identifying "which of these . . . countries
had the largest imports . . . during the POR . . . is consistent with our practice of determining
whether an SV is aberrational . . . ."  Chlorinated Isocyanurates 2012–2013 at 9 & n.43 (citing
Issues and Decision Memorandum for the Final Results in the Administrative Review of Glycine
from the People's Republic of China at 6–9, A-570-836 (Oct. 9, 2012) available at
http://enforcement.trade.gov/frn/summary/prc/2012-25595-1.pdf (last visited Nov. 14, 2016)).
Thus, the practice mentioned refers to how to determine whether an SV is aberrational, rather
than a selection methodology.  Still, Commerce is required under the substantial evidence
standard to "articulate a satisfactory explanation for its action."  Bestpak, 716 F.3d at 1378.

whose production of activated carbon is similar to the intensity of the industry[.]"). Commerce

states it relied on significant production "because that is a factor in determining the overall

surrogate country." Id. at 34 (citing Policy Bulletin 04.1). Commerce further explained "the

greater the significant production of activated carbon, the greater the intensity of the industry

within a particular country, and thus, the greater potential of broad-based demand for import of

the inputs used in production of the comparable merchandise." Id. at 16.

Commerce erred by not engaging in a meaningful comparative analysis in selecting

between the two so-called "tie-breaking" methodologies before it. Commerce's superficial

reasoning failed to acknowledge that in the situations where Commerce must choose between

fairly equal SVs there will always be relative size differences in significant production (as well

as in import volume) and did not adequately provide standards or explain at what point a

difference in significant production is meaningful enough to affect broad-based demand for

imports, and why that is more important than a greater amount of imports, as they result in

broader market averages. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983) ("[T]he agency must . . . articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" (quoting

Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  In short, Commerce's self-

affirming rationale applies to every situation where Commerce chooses between at least two

fairly equal SVs, and Commerce therefore has not provided a case-specific reason for why it

chose this methodology in this circumstance.

Commerce's explanation also does not show a rational connection to the record. For

instance, Commerce did not weigh the fact that although the relative size of the significant

production quantities differed, so too did the relative size of import volumes, which formed the

underlying data to calculate the different AUVs.  The following table represents the different

methods by which to rank the countries for which Commerce evaluated potential SVs,[22] but

excludes the Philippines and Indonesia, for which Commerce determined the appropriate POR6-

contemporaneous SV data were not reliable, see Remand Results at 16–17:

| Significant Production | Import Volume |
|---|---|
| 1.  Thailand<br>(6,555,094 kilograms) | 1.  South Africa<br>(81,501,689 kilograms) |
| 2.  South Africa<br>(662,157 kilograms) | 2.  Ukraine<br>(14,747,893 kilograms) |
| 3.  Colombia<br>(287,186 kilograms) | 3.  Thailand<br>(681,930 kilograms) |
| 4.  Ukraine<br>(43,329 kilograms) | 4.  Colombia<br>(37,749 kilograms) |

---

[22] More specifically, Commerce ranked significant production based on exports during the POR as follows:  (1) the Philippines with 56,444,767 kilograms, (2) Indonesia with 22,835,450 kilograms, (3) Thailand with 6,555,094 kilograms, (4) South Africa with 662,157 kilograms, (5) Colombia with 287,186 kilograms, and (6) Ukraine with 43,329 kilograms.  Remand Results at 33 & nn.145–47 (citing Pet'rs Cmts. on Surrogate Selection at 4, PD 128 (Oct. 23, 2013) ("Pet'rs' Surrogate Country Cmts.") (the Philippines, Indonesia, Thailand, South Africa and Colombia); Jacobi Cmts. on Surrogate Selection at Attach. A, PD 126 (Oct. 23, 2013) (Ukraine)).  As the Respondents explain, the surrogate countries ranked based on import volumes during the POR would appear as the following:  (1) South Africa with 81,501,689 kilograms, (2) Ukraine with 14,747,893 kilograms, (3) Indonesia with 1,797,220 kilograms, (4) Thailand with 681,930 kilograms, (5) the Philippines with 86,354 kilograms, and (6) Colombia with 37,749 kilograms.  Cherishmet's SV Cmts. at Exs. 3D–3E (South Africa and Ukraine); Pet'rs' SV Cmts. at Ex. 2A (Indonesia and the Philippines); Pet'rs' Final SV Data at Attach. (Thailand and Colombia).

Commerce's stated concern in the Remand Results stems from the "relative size" of the

significant production when moving from Thailand to South Africa,[23] the difference of which

can be measured in absolute terms as 5,892,937 kilograms or in relative terms as almost ten

times. Remand Results at 33. But, Commerce fails to adequately explain why that difference is

more important than the difference in import volume when moving from Thailand to the next

country above by import volume, i.e., Ukraine, which in absolute terms is 14,065,963 kilograms

or in relative terms is over twenty-one times. Thus, the relative size difference for import

volumes, which would affect whether the data relate to broad market averages, seems to be even

more drastic than for significant production. And, as the Respondents argue, import volume may

well be more important than significant production because the AUV used by Commerce is

calculated based on these import volumes. See, e.g., Cherishmet Cmts. at 15. Without

addressing these important concerns, Commerce cannot continue to rely on its significant

production rationale in this case. See Peer Bearing Co.-Changshan v. United States, 752 F.

Supp. 2d 1353, 1372–73 (CIT 2012) ("Commerce must provide a rational explanation for its

choice.").[24]

---

[23] This is true because Commerce determined that the POR6-contemporaneous GTA data from
the Philippines and Indonesia were not appropriate for use as an SV and, therefore, did not select
the two largest significant producers. Remand Results at 16–17. Because Commerce selected
Thailand, clearly its concern stemmed from the drop-off in significant production from the third
largest significant producer (Thailand) to the fourth (South Africa).

[24] Further, Commerce's general belief that greater significant production creates greater intensity
within the industry and greater potential for broad-based demand is belied by the only record
evidence that speaks to this question. The only record evidence that speaks squarely to the
question of "broad-based demand for import of the inputs used in production of the comparable
merchandise," see Remand Results at 16, is the evidence of anthracite coal (an input in activated
carbon) actually imported into each surrogate country. The import data demonstrates, then, that
Thailand in reality did not have the highest import demand for anthracite coal under HTS

(continued . . .)

Commerce's statement that it relied on significant production "because that is a factor in determining the overall surrogate country," Remand Results at 34 (citing Policy Bulletin 04.1), does not save Commerce's reasoning.  As Commerce knows, the statute requires merely that Commerce in the NME context "to the extent possible" value FOPs "in one or more [ME] countries that are . . . significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  And, Commerce fulfilled that duty:  Commerce's Remand Results make clear that Commerce found Colombia, Thailand, South Africa, and Ukraine, all significant producers of activated carbon.  Id. at 8, 12, 13.  Although the court does not hold that Commerce cannot or should not consider comparative significant production in appropriate situations, the court recognizes that Commerce has not demonstrated that this is such a situation.  Commerce has not explained why this approach and the statute's mention of significant production for another purpose outweigh its alternative approach of using import volumes, which addresses broad market averages, representativeness, and the statute's goal of calculating AD margins "as accurately as possible."  Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the [FOPs], the critical question is whether the methodology used by Commerce is based on the best

---

2701.11.  Even though Commerce believes Thailand has a greater "potential" for broad-based demand for anthracite coal, that belief is controverted by the record evidence pertaining to import demand and any belief that Commerce may have with regard to broad-based demand for anthracite coal from domestic sources in each of the surrogate countries is clearly reliant on impermissible speculation.  See Zhejiang Native Produce and Animal By-Products Imp. & Exp. Grp. Corp. v. United States, 32 CIT 673, 687 (2008) ("Commerce's determination must be based on record evidence and not speculation.").  Thus, Commerce failed to provide a sufficient explanation for its selection of a tie-breaking methodology based on this record.

available information and establishes antidumping margins as accurately as possible.").[25]  Thus,

Commerce has failed to ground its choice of methodology in relevant findings that are supported

by substantial evidence on the record of this case.

---

[25] Jacobi also argues that Commerce improperly applied its tie-breaking methodology when it determined that Thailand is a significant producer of activated carbon (1) because Commerce disregarded the legislative history's requirements that it be a "significant" and "net" exporter and (2) because Thailand is a net importer by value of activated carbon.  See Jacobi Cmts. at 15–17. As Jacobi concedes, the statute is silent as to what constitutes a "significant producer" and the legislative history, which clarifies that "'significant producer' includes any country that is a significant net exporter," does not define the term "significant net exporter."  H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.).

Commerce's interpretation of significant producer, which looked to whether the country exported comparable merchandise, is reasonable.  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1989); DuPont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005).  First, the legislative history does not purport to create an exhaustive definition of significant producer but instead states that the term significant producer "includes" significant net exporters.  See H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.). Commerce did not act arbitrarily in adopting this definition, as it has defined significant producers based on exported comparable merchandise in the past.  See Decision Memorandum for Prelim. Determination of the Antidumping Duty Investigation of Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China at 18, A-570-018 (Mar. 24, 2015), available at http://enforcement.trade.gov/frn/summary/prc/2015-07475-1.pdf (last visited Nov. 14, 2016).  In any event, Jacobi concedes that Thailand was a net exporter by quantity.  See Jacobi Cmts. at 15–16 (stating that Thailand had net exports of about 862,000 kilograms).  Jacobi has not explained why approximately 862,000 kilograms would constitute insignificant net exports, and, given that Commerce found Thailand's imports of 681,930 kilograms to be of a commercial quantity, the court cannot discern such an explanation on this record.  See Remand Results at 35 ("[T]he fact that a country exports comparable merchandise to other countries [is] a strong indication that the country is a significant producer of such merchandise.").  Second, although Jacobi argues that Thailand was a net importer of activated carbon by value, Commerce's reliance on quantity is also reasonable.  Commerce explained that in evaluating whether a country is a significant producer, it "consider[s] quantity, rather than value, . . . because quantities are not subject to influence from outside variables, such as currency fluctuations and inflation, among other external pressures."  Remand Results at 35.  The record evidence indicated that during the POR Thailand exported 6,555,094 kilograms of activated carbon.  See, e.g., Pet'rs' Surrogate Country Cmts. at 4.  Accordingly, Commerce lawfully determined that Thailand is a significant producer.  Remand Results at 36.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Remand Results</u> are remanded for Commerce to reconsider its selection of an SV for anthracite coal in accordance with this opinion, by either further explaining its selection methodology and basing that explanation on the record evidence or by choosing its other selection methodology based on import volume.  Commerce shall have until January 3, 2017, to file its remand results.  The parties shall have until January 23, 2017, to file objections, and the government shall have until February 3, 2017, to file its response.

 /s/ Jane A. Restani
Jane A. Restani
Judge

Dated: November 18, 2016
  New York, New York